# 22-76(L)

**22-496(CON)**

*To Be Argued By*:
BENJAMIN H. TORRANCE

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket Nos. 22-76(L), 22-496(CON)

MIRIAM FULD, individually, as personal representative and administrator of the Estate of Ari Yoel Fuld, deceased, and as natural guardian of plaintiff Natan Shai Fuld, NATAN SHAI FULD, minor, by his next friend and guardian Miriam Fuld, NAOMI FULD, TAMAR GILA FULD, and ELIEZER YAKIR FULD,

*Plaintiffs-Appellants*,

UNITED STATES OF AMERICA,

*Intervenor-Appellant*,

*(Caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## INTERVENOR-APPELLANT'S PETITION
## FOR REHEARING EN BANC

BRIAN M. BOYNTON,
*Principal Deputy
Assistant Attorney
General*
SHARON SWINGLE,
COURTNEY L. DIXON,
*Attorneys, Appellate Staff
Civil Division
Department of Justice*

DAMIAN WILLIAMS,
*United States Attorney for the
Southern District of New York,
Attorney for Intervenor-Appellant.*
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2703

BENJAMIN H. TORRANCE,
*Assistant United States Attorney,
Of Counsel.*

—v.—

THE PALESTINE LIBERATION ORGANIZATION and
THE PALESTINIAN AUTHORITY (a/k/a "The Palestinian Interim
Self-Government Authority," and/or "The Palestinian Council,"
and/or "The Palestinian National Authority"),

*Defendants-Appellees.*

# TABLE OF CONTENTS

PAGE

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . 2

   A.   Background . . . . . . . . . . . . . . . . . . . . . . . . . 2

      1.   The PA and PLO . . . . . . . . . . . . . . . . . 2

      2.   The ATA and PSJVTA. . . . . . . . . . . . . 3

   B.   District Court Proceedings. . . . . . . . . . . . . 5

   C.   The Panel Decision . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

   A.   The PSJVTA Reasonably Establishes
       Personal Jurisdiction . . . . . . . . . . . . . . . . . 8

   B.   The Panel Misapplied the
       Requirements of Due Process . . . . . . . . . . 10

   C.   The Fifth Amendment's Due Process
       Standards Permit the PSJVTA's
       Basis for Jurisdiction . . . . . . . . . . . . . . . . . 14

ii

PAGE

# TABLE OF AUTHORITIES

*Cases*:

*Bank Markazi v. Peterson*,
    578 U.S. 212 (2016) . . . . . . . . . . . . . . . . . . . . . . . 14

*Bristol-Myers Squibb Co. v. Superior Court*,
    582 U.S. 255 (2017) . . . . . . . . . . . . . . . . . . . . . 14, 15

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Burnet v. Brooks*,
    288 U.S. 378 (1933) . . . . . . . . . . . . . . . . . . . . . . . 16

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014) . . . . . . . . . . . . . . . . . . . . . . . . 4

*EEOC v. Arabian American Oil Co.*,
    499 U.S. 244 (1991) . . . . . . . . . . . . . . . . . . . . . . . 15

*Fuld v. PLO*,
    82 F.4th 74 (2d Cir. 2023) . . . . . . . . . . . . . . *passim*

*Fuld v. PLO*,
    578 F. Supp. 3d 577 (S.D.N.Y. 2022) . . . . . . . . 6, 11

*Insurance Corporation of Ireland v.*
    *Compagnie des Bauxites de Guinee*,
    456 U.S. 694 (1982) . . . . . . . . . . . . . . . . . . . *passim*

*J. McIntyre Machinery, Ltd. v. Nicastro*,
    564 U.S. 873 (2011) . . . . . . . . . . . . . . . . . . . . . . . 15

*Klinghoffer v. S.N.C. Achille Lauro*,
    937 F.2d 44 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . 3

iii

PAGE

*Mallory v. Norfolk Southern Railway Co.*,
    600 U.S. 122 (2023). . . . . . . . . . . . . . . . . . . *passim*

*Sokolow v. PLO*,
    590 F. Supp. 3d 589 (S.D.N.Y. 2022) . . . . . . . . . . 6

*United States v. Curtiss-Wright Export Corp.*,
    299 U.S. 304 (1936). . . . . . . . . . . . . . . . . . . . . . . 16

*Waldman v. PLO*,
    835 F.3d 317 (2d Cir. 2016) . . . . . . . . . . . . . . 4, 14

*Waldman v. PLO*,
    82 F.4th 64 (2d Cir. 2023) . . . . . . . . . . . . . . . . . 7

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980). . . . . . . . . . . . . . . . . . . . . . . 15

*Statutes*:

18 U.S.C. § 2334 . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

22 U.S.C. § 2378b . . . . . . . . . . . . . . . . . . . . . . . . . . 2

22 U.S.C. § 5201 . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

22 U.S.C. § 5202 . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Pub. L. No. 102-572 . . . . . . . . . . . . . . . . . . . . . . . . 4

Pub. L. No. 109-446 . . . . . . . . . . . . . . . . . . . . . . . . 2

Pub. L. No. 115-253 . . . . . . . . . . . . . . . . . . . . . . . . 4

Pub. L. No. 116-94 . . . . . . . . . . . . . . . . . . . . . . . . . 4

Pub. L. No. 117-103 . . . . . . . . . . . . . . . . . . . . . . . . 2

iv

PAGE

*Rules*:

Fed. R. App. P. 35(a)(2) . . . . . . . . . . . . . . . . . . . . . . . 2

*Other Authorities*:

Restatement (Third) of Foreign Relations Law
  § 421(2)(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

### Docket Nos. 22-76(L), 22-496(con)

---

## INTERVENOR-APPELLANT'S PETITION FOR REHEARING EN BANC

---

To ensure American victims of international terrorism are able to seek redress in U.S. courts, Congress enacted the Promoting Security and Justice for Victims of Terrorism Act ("PSJVTA"). That statute provides that if the Palestinian Authority ("PA"), the Palestine Liberation Organization ("PLO"), or their successors or affiliates engage in certain activities, they will be deemed to have consented to personal jurisdiction in civil cases under the Anti-Terrorism Act of 1992 ("ATA"). By ensuring this nation's courts can exercise personal jurisdiction over those defendants, Congress sought to make the ATA's civil-remedies provision effective and to advance important foreign-policy objectives.

A panel of this Court erroneously held the PSJVTA's jurisdictional provision is inconsistent with due process. Consent, including implicit or constructive consent, is a valid basis for personal jurisdiction, and Congress's decision to "deem" specified activities of the PA and PLO to be consent to jurisdiction in the PSJVTA—activities in the United States or closely linked to the civil ATA claims at issue, with advance notice to the PA and PLO and an opportunity to cease

2

engaging in them, and in furtherance of the political branches' authority over foreign affairs—was entirely reasonable and proportional. That is particularly true under the standards of the Fifth Amendment, which, properly understood, permits a federal court to exercise more expansive personal jurisdiction over a foreign defendant in a case like this than state courts may exercise under the Fourteenth Amendment.

Because the invalidation of an Act of Congress is a "question of exceptional importance," Fed. R. App. P. 35(a)(2), rehearing en banc is warranted to correct the panel's errors.

## Statement of the Case

### A.  Background

#### 1.  The PA and PLO

In 1987, Congress "determine[d] that the PLO and its affiliates are a terrorist organization and a threat to the interests of the United States, its allies, and to international law and should not benefit from operating in the United States." 22 U.S.C. § 5201(b). Congress thus made it unlawful for the PLO or "its constituent groups" to "establish or maintain an office, headquarters, premises, or other facilities or establishments" within the U.S. *Id.* § 5202; *see also* Pub. L. No. 109-446, § 7, 22 U.S.C. § 2378b note (prohibition of PA facilities in U.S. under certain circumstances). Although the Executive Branch has authority to waive this prohibition, *e.g.,* Pub. L. No. 117-103,

3

§ 7041(*l*)(3)(B) (2022), no such waiver is currently in effect.[1]

The PLO has been recognized by the United Nations as the representative of the Palestinian people, and the United States has engaged with it on that basis since the time of the Oslo Accords. The PA was created under the Oslo Accords to exercise interim governance authority for the Palestinian people in Gaza and the West Bank. The United States does not recognize either the PA or the PLO as a sovereign government. As a matter of historical practice, Congress and the Executive Branch have worked together closely to determine U.S. policies with respect to those entities.[2]

## 2. The ATA and PSJVTA

In the ATA, "to develop a comprehensive legal response to international terrorism," Congress created a civil damages remedy for U.S. nationals harmed by an act of international terrorism. H.R. Rep. No. 102-1040,

---

[1] The PLO's U.N. Observer Mission is not subject to this prohibition. *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 46 (2d Cir. 1991).

[2] The United States currently assists training of PA security forces, a key partner in efforts to stabilize the West Bank. Anticipating an end to the current conflict between Hamas and Israel, the United States has expressed the view that the future of Gaza must include Palestinian-led governance and Gaza unified with the West Bank under the PA.

4

at 5 (1992) ("1992 House Report"); *see* Pub. L. No. 102-572, § 1003(a), 106 Stat. 4506, 4521-24 (1992).

Before 2014, courts regularly exercised general personal jurisdiction in ATA cases against the PA and PLO based on their contacts with the United States. But following *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014), courts—including this Court—concluded the PA and PLO were not subject to general jurisdiction; they also declined to exercise specific personal jurisdiction over those entities. *Waldman v. PLO*, 835 F.3d 317, 337 (2d Cir. 2016).

Congress responded in 2018 by enacting the Anti-Terrorism Clarification Act, which provided that in an ATA action, "a defendant shall be deemed to have consented to personal jurisdiction" if it satisfied certain conditions. Pub. L. No. 115-253, § 4, 132 Stat. 3183, 3184. After this Court and others held those factual predicates were not satisfied in cases against the PA and PLO, Congress enacted the PSJVTA. Pub. L. No. 116-94, § 903, 133 Stat. 2534, 3082 (Dec. 20, 2019). The PSJVTA defines "defendant" to include the PA, PLO, and their affiliates and successors, and revises the factual predicates for those defendants' conduct that will be deemed consent to personal jurisdiction in civil ATA actions. *Id.* § 903(c)(1)(A).

The PSJVTA first focuses on payments to terrorists in Israeli prisons and to the families of those killed while committing terrorist acts that injure or kill a U.S. national. A defendant "shall be deemed to have consented to personal jurisdiction" in ATA cases if, more than 120 days after the PSJVTA's enactment (i.e., after April 18, 2020), it

5

makes any payment, directly or indirectly—

(i) to any payee designated by any individual who, after being fairly tried or pleading guilty, has been imprisoned for committing any act of terrorism that injured or killed a national of the United States, if such payment is made by reason of such imprisonment; or

(ii) to any family member of any individual, following such individual's death while committing an act of terrorism that injured or killed a national of the United States, if such payment is made by reason of the death of such individual . . . .

18 U.S.C. § 2334(e)(1)(A).

The PSJVTA next provides a defendant "shall be deemed to have consented to personal jurisdiction" if more than fifteen days after the PSJVTA's enactment (i.e., after January 4, 2020), it maintains, establishes, or procures any office in the U.S. or "conducts any activity while physically present in the United States on behalf of" the PLO or PA, outside exceptions related to U.N. business, activities involving government officials or certain training activities, legal representation, or ancillary activities. 18 U.S.C. § 2334(e)(1)(B), (e)(3).

## B. District Court Proceedings

These two ATA actions were brought against the PA and PLO by U.S.-national victims of terrorism or

6

their families. In both cases, plaintiffs assert personal jurisdiction under the PSJVTA, alleging the payments prong and U.S.-activities prong are satisfied.

The district courts held the PSJVTA's deemed-consent provision is inconsistent with Fifth Amendment due process. The courts recognized that due process permits personal jurisdiction based on a defendant's express or implied consent. *Fuld v. PLO*, 578 F. Supp. 3d 577, 585-86 (S.D.N.Y. 2022); *Sokolow v. PLO*, 590 F. Supp. 3d 589, 595-96 (S.D.N.Y. 2022). But they concluded it is not reasonable to infer the PA and PLO have knowingly and voluntarily consented to jurisdiction, even if they have undertaken the activities the PSJVTA deems to constitute consent. *Fuld*, 578 F. Supp. 3d at 586-94; *Sokolow*, 590 F. Supp. 3d at 596-97.

## C.  The Panel Decision

A panel of this Court affirmed both decisions, writing its primary analysis in *Fuld* ("Op."; 82 F.4th 74 (2d Cir. 2023)). The panel recognized that express or implied consent can be manifested through a "variety of legal arrangements." (Op. 24-25 (quotation marks omitted)). The panel reasoned, however, that "consent cannot be found based solely on a government decree pronouncing that activities unrelated to being sued in the forum will be 'deemed' to be 'consent' to jurisdiction there." (Op. 26).

In the panel's view, the PSJVTA's payments prong improperly imposed a "jurisdictional sanction" on the PA and PLO in order to "deter a congressionally disfavored activity." (Op. 33-34). The panel found the U.S.-

7

activities prong similarly insufficient, reasoning that separate laws prohibit the PA and PLO from engaging in activity in the U.S. absent "specific executive or statutory waivers"; the PSJVTA does not "purport to relax or override" those statutory prohibitions and thus does not confer any "rights or benefits on the [PA and PLO] in return" for their consent to jurisdiction. (Op. 35-37).

Regarding the Supreme Court's decision in *Mallory v. Norfolk Southern Railway Co.*, 600 U.S. 122 (2023), which upheld a state law conditioning registration to do business in the state on a business's agreement to appear in the state's courts, the panel determined the out-of-state defendant had received a "benefit" in "exchange" for agreeing to "be sued in that jurisdiction," and the acceptance of that benefit was sufficient to constitute implied consent. (Op. 42-43). But the panel stated its view that the PSJVTA offers no similar benefit to the PA and PLO, and therefore consent to jurisdiction could not be inferred. (Op. 44).

The panel also held the Fifth Amendment does not subject Congress to a more "lenient due process standard" than states under the Fourteenth Amendment. (Op. 59). The panel reaffirmed this Court's precedent that the Fifth Amendment and Fourteenth Amendment analyses are the same, and regardless found no reason to treat them differently. (Op. 60-61).

In *Waldman*, the panel incorporated its analysis in *Fuld* and again held the PSJVTA violates due process. 82 F.4th 64, 73 (2d Cir. 2023).

8

**A R G U M E N T**

Rehearing is warranted to correct the panel's erroneous decision, which held unconstitutional an Act of Congress designed to ensure the ATA's civil-liability provision functions effectively to combat international terrorism harming Americans.

## A. The PSJVTA Reasonably Establishes Personal Jurisdiction

"'[E]xpress or implied consent' can . . . ground personal jurisdiction—and consent may be manifested in various ways by word or deed." *Mallory*, 600 U.S. at 138 (plurality op.) (quoting *Insurance Corporation of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982)). "'[A] variety of legal arrangements'" can therefore constitute consent "consistent with due process." *Id.* at 136 n.5 (majority op.) (quoting *Bauxites*, 456 U.S. at 703; quotation marks and alteration omitted).

The PSJVTA creates one such legal arrangement, and it was "hardly unfair" for Congress to have done so. *Id.* at 146 n.11 (plurality op.); *see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985) (consent-based personal jurisdiction arrangement "does not offend due process" where consent was not "unreasonable and unjust" (quotation marks omitted)). The statute permits "deemed" consent to personal jurisdiction only in a limited class of cases: civil actions under the ATA by U.S. nationals who were victims of terrorism. It applies only to a limited group of defendants: the PLO and PA and their successors and affiliates—*sui generis* foreign entities that exercise governmental

9

power but have not been recognized as a sovereign government by the Executive Branch. The only payments it deems to constitute consent to jurisdiction are those connected to attacks that killed or injured U.S. nationals, closely linking that prong to the ATA's cause of action for U.S. nationals who are victims of international terrorism. And the U.S.-activities prong is connected to longstanding antiterrorism-related conditions that Congress and the Executive have imposed on the PA and PLO.

Thus, since the PSJVTA's enactment the PA and PLO have had fair notice of what actions will be deemed to be consent for civil ATA claims, and those actions are reasonably connected to the ATA claims that may proceed. And the PA and PLO have had the opportunity to choose whether to continue such actions —that is, to "structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *Burger King*, 471 U.S. at 472 (quotation marks omitted). A federal court's exercise of jurisdiction over them under the PSJVTA therefore does "not offend traditional notions of fair play and substantial justice." *Bauxites*, 456 U.S. at 702-03 (quotation marks omitted).

*Mallory* confirms the PSJVTA's constitutionality. The Supreme Court upheld as consistent with due process a Pennsylvania law providing that an out-of-state company's registration as a foreign corporation made the company amenable to suit in Pennsylvania courts "on any claim." 600 U.S. at 135 (majority op.). The Court explained that Pennsylvania's law was "explicit" that registration in the state would permit state courts

10

"to exercise general personal jurisdiction" over a foreign corporation, and that the out-of-state defendant "understood" it would be "amenable to suit on any claim" as a result of registering. *Id.* at 135 (majority op.) (quotation marks omitted); *accord id.* at 150-52 (Alito, J., concurring in part and concurring in judgment) (consent occurred where defendant "acted with knowledge" or "took steps" that "were understood as consent" (quotation marks omitted)); *id.* at 148 (Jackson, J., concurring) (when defendant "made th[e] decision" to register "the jurisdictional consequences of registration were clear").

The PSJVTA similarly gives clear notice to the PA and PLO as to what conduct will be deemed consent to jurisdiction in U.S. courts. Indeed, the PSJVTA's deemed-consent provision is much narrower than the business-registration statute in *Mallory*: the PSJVTA is targeted to a specific type of claim—civil ATA claims—and is limited to a class of defendants that are *sui generis* foreign entities that have a unique relationship with the U.S. government and that may seek to engage in activities in the United States, or to have made payments to those responsible for injuring U.S. nationals or their families.

## B. The Panel Misapplied the Requirements of Due Process

In reaching its contrary conclusion, the panel took too narrow a view of the circumstances in which consent may be implied from a defendant's conduct and failed to give sufficient weight to the limitations in the

11

PSJVTA and the unique foreign-affairs context in which it was enacted.

The panel recognized that "a variety of legal arrangements" may represent a defendant's consent to personal jurisdiction, which may be express or implied. (Op. 24-26 (quotation marks omitted)). But the panel interpreted the case law to essentially recognize only two ways a defendant may impliedly consent: through "litigation-related conduct" (Op. 27-28), or due to a defendant's "reciprocal bargain[ ]" to accept a "government benefit" in exchange for submission to the forum (Op. 26-27, 29-30). The panel concluded that neither circumstance was present here and therefore consent could not fairly be implied under the PSJVTA.

But that is too narrow an understanding of the circumstances under which consent to jurisdiction can be inferred. *See Bauxites*, 456 U.S. at 704-05 (even absent intentional waiver of the personal jurisdiction requirement, there are "various reasons" a defendant may lose that protection). Nothing in the Fifth Amendment's text or history or in the case law concerning personal jurisdiction limits implied consent to litigation-related conduct or a "reciprocal bargain" for a government benefit. *See Fuld*, 578 F. Supp. 3d at 595 n.10 (no case holds "receipt of a benefit is a necessary condition" to consent). Nor is *Mallory*'s reasoning limited to only an "exchange" of benefits. As discussed above, *Mallory* relied on the fact that the defendant had "understood" that by registering in the jurisdiction it would be "amenable to suit" there, and reiterated that a "variety" of mechanisms may demonstrate consent to jurisdiction. 600 U.S. at 135-36 & n.5 (majority

12

op.); *id.* at 150-52 (op. of Alito, J.); *id.* at 148 (Jackson, J., concurring). Indeed, even "mere formalities" unconnected to litigation can have "jurisdictional consequences." *Id.* at 145 (plurality op.).

Where, as here, Congress provided fair notice to a limited, *sui generis* class of defendants of what conduct will be deemed consent for a specific type of claim, and the identified conduct is fairly connected to the subject matter of the litigation and the United States as a forum, it is fair and reasonable for federal courts to exercise jurisdiction over defendants on that specific type of claim, even if there is not a "reciprocal" exchange of benefits. (Op. 30). Moreover, at least with respect to the U.S.-activities prong, the United States has indeed conferred a "benefit" (Op. 37): to the extent the PA and PLO are performing activities in the U.S. that satisfy that prong, they are receiving the benefit of being permitted to do so because the United States could limit or prohibit them from engaging in those activities in the U.S.—and, in some cases, has done so. *See supra* Statement A.1. The activities prong thus serves the same function as registration in *Mallory* in subjecting defendants to suit. It does "not offend traditional notions of fair play and substantial justice" for Congress to specify that the performance of such activities will be considered consent to personal jurisdiction in U.S. courts. *Bauxites*, 456 U.S. at 702-03 (quotation marks omitted).

The panel further erred in concluding the PSJVTA's prongs lack a sufficient "connection" to the subject matter of the litigation and the U.S. as a forum. (Op. 40). The panel's reasoning fails to account for the

13

United States' unique relationship with the PA and PLO and the particular foreign-affairs context in which the PSJVTA was enacted.

The civil-liability provision of the ATA is intended to be part of Congress's "comprehensive legal response to international terrorism." 1992 House Report at 5. Congress determined, however, that because courts have held that the PA and PLO are not subject to general personal jurisdiction in the U.S., the goals of the ATA were not being realized; Congress therefore enacted the PSJVTA so that the ATA's civil-liability provision could function effectively.

The actions of the PA and PLO that Congress selected in the PSJVTA as a basis for personal jurisdiction for civil ATA claims are consistent with this legislative purpose and have a reasonable connection to the subject matter of the litigation and the U.S. as a forum. Where Congress has found that payments by the PA and PLO to designees and family members of persons who committed acts of terrorism that killed or injured U.S. nationals incentivize terrorist actions, it is fair and reasonable for Congress to deem the PA's and PLO's continuation of such payments to constitute their consent to personal jurisdiction in U.S. courts on civil claims for the same type of conduct. Similarly, where Congress and the Executive Branch have long conditioned the PA's and PLO's ability to engage in a range of activities in the U.S. on the judgments of the political branches concerning their renunciation of terrorism and commitment to peace, it is fair and reasonable for Congress to specify that to the extent the PA and PLO continue to perform certain activities in the

14

United States, the performance of those activities will be deemed consent to personal jurisdiction in U.S. courts for terrorism-related claims.

The PSJVTA's provisions must be understood in light of this foreign-affairs context. Significantly, Congress's judgment on such "matter[s] of foreign policy" "warrants respectful review by courts." *Bank Markazi v. Peterson*, 578 U.S. 212, 215 (2016). Rehearing en banc should be granted to correct the panel's errors.

## C. The Fifth Amendment's Due Process Standards Permit the PSJVTA's Basis for Jurisdiction

In holding the PSJVTA unconstitutional, the panel also reaffirmed this Court's precedent that the personal-jurisdiction analysis is "basically the same" under the Fifth and Fourteenth Amendments. (Op. 21 & n.6 (citing *Waldman*, 835 F.3d at 330)). Although the PSJVTA is constitutional even under the Fourteenth Amendment's limitations, this Court should grant review to reconsider its prior conclusion that the analyses are the "same." *Id.* Properly understood, the Fifth Amendment permits federal courts to assert personal jurisdiction over a foreign defendant in certain circumstances that have no analogue for a state court exercising personal jurisdiction under the Fourteenth Amendment.

The Supreme Court has "le[ft] open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court" as the Fourteenth Amendment. *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S.

15

255, 268-69 (2017). But members of the Court have observed that "personal jurisdiction requires a forum-by-forum, or sovereign-by-sovereign, analysis." *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011) (plurality op.).

Importantly, the limitations recognized in the Fourteenth Amendment context reflect not only concerns about fairness to individual defendants but also concerns about federalism and the limited and mutually exclusive sovereignty of the several states. *See, e.g.*, *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291-94 (1980). The panel minimized those federalism concerns, reasoning that the restrictions on personal jurisdiction are "'ultimately a function of the individual liberty interest.'" (Op. 60-61 (quoting *Bauxites*, 456 U.S. at 702 & n.10)). But that individual liberty interest "depends on whether the sovereign has authority to render" a judicial judgment against that individual. *Nicastro*, 564 U.S. at 884 (plurality op.). The states' authority to do so turns on "territorial limitations" on their power, meaning that "at times, th[e] federalism interest may be decisive." *Bristol-Myers*, 582 U.S. at 263.

But that federalism interest does not apply to the United States, which has authority over foreign commerce and foreign affairs and, unlike a state, power "to enforce its laws beyond [its] territorial boundaries." *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991). Moreover, the United States' "powers of external sovereignty" and its ability to conduct relationships with foreign actors are grounded in the United States' status in international law as an independent

state. *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936). While "[t]he limits of [an individual U.S. state's] power are defined in view of the relation of the states to each other in the Federal Union," the United States' power "in relation to other countries and their subjects" is informed by "the principles of jurisdiction recognized in international relations." *Burnet v. Brooks*, 288 U.S. 378, 396, 403-06 (1933).

At a minimum, this context suggests the Fourteenth Amendment's limitations should not be adopted reflexively into the Fifth Amendment. *See, e.g.*, Restatement (Third) of Foreign Relations Law § 421(2)(j) ("In general, a state's exercise of jurisdiction to adjudicate with respect to a person . . . is reasonable if, at the time jurisdiction is asserted . . . the person . . . had carried on outside the state an activity having a substantial, direct, and foreseeable effect within the state . . . ."). The United States' position as a sovereign in the international community and its special competence in matters of foreign affairs and international commerce are relevant to whether a federal court's exercise of jurisdiction over a foreign defendant pursuant to congressional authorization is fair and reasonable, and those considerations should inform the analysis of what conduct is fair for Congress to deem consent to jurisdiction in U.S. courts on a particular type of claim. That is particularly so with respect to foreign entities such as the PA and PLO that exercise governmental power but have not been recognized as a sovereign government by the Executive.

17

As discussed above, Congress has enacted numerous laws, including the ATA, combating acts of international terrorism outside the United States that affect U.S. persons and interests, and Congress has sought to make that legislation effective by putting the PA and PLO on reasonable notice that engaging in certain related activities will subject them to the adjudicative authority of federal courts for purposes of those specific claims. Even if a state could not enact similar legislation consistent with structural limitations on state authority and the Fourteenth Amendment, the Fifth Amendment does not prohibit the United States from determining that certain actions of the PA and PLO properly subject them to personal jurisdiction in U.S. courts in these limited circumstances.

\* \* \*

18

**The Court should grant rehearing en banc.**

Dated:     New York, New York
           November 22, 2023

                    Respectfully submitted,

                    DAMIAN WILLIAMS,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for Intervenor-Appellant.*

                    BENJAMIN H. TORRANCE,
                    *Assistant United States Attorney,*
                         *Of Counsel.*

BRIAN M. BOYNTON,
*Principal Deputy Assistant Attorney General*

SHARON SWINGLE,
COURTNEY L. DIXON,
*Attorneys, Appellate Staff*
*Civil Division*
     *Department of Justice*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 3900 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: BENJAMIN H. TORRANCE,
*Assistant United States Attorney*

**ADDENDUM**

# Add. 1

22-76-cv (L)
Fuld v. Palestine Liberation Organization

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————————————————————

August Term 2022
Argued: May 3, 2023
Decided: September 8, 2023

Docket Nos. 22-76-cv (L), 22-496-cv (Con)

————————————————————

MIRIAM FULD, INDIVIDUALLY, AS PERSONAL REPRESENTATIVE AND ADMINISTRATOR
OF THE ESTATE OF ARI YOEL FULD, DECEASED, AND AS NATURAL GUARDIAN OF
PLAINTIFF NATAN SHAI FULD, NATAN SHAI FULD, MINOR, BY HIS NEXT FRIEND AND
GUARDIAN MIRIAM FULD, NAOMI FULD, TAMAR GILA FULD, AND ELIEZER YAKIR
FULD,

*Plaintiffs – Appellants,*

UNITED STATES OF AMERICA,

*Intervenor – Appellant,*

—v.—

THE PALESTINE LIBERATION ORGANIZATION AND THE PALESTINIAN AUTHORITY
(A/K/A "THE PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY," AND/OR "THE
PALESTINIAN COUNCIL," AND/OR "THE PALESTINIAN NATIONAL AUTHORITY"),

*Defendants – Appellees.\**

————————————————————

————————————

\* The Clerk of Court is directed to amend the official caption as set forth above.

# Add. 2

Before: LEVAL AND BIANCO, *Circuit Judges*, AND KOELTL, *District Judge*.[**]

The plaintiffs, several family members of a United States citizen killed in an overseas terrorist attack, appeal from a judgment of the United States District Court for the Southern District of New York (Furman, J) dismissing their claims against the Palestine Liberation Organization ("PLO") and the Palestinian Authority ("PA") for lack of personal jurisdiction. The Government, as intervenor in accordance with 28 U.S.C. § 2403(a) and Federal Rule of Civil Procedure 5.1(c), also appeals from that judgment. On appeal, both the plaintiffs and the Government argue that the district court erred in finding unconstitutional the Promoting Security and Justice for Victims of Terrorism Act of 2019 ("PSJVTA"), Pub. L. No. 116-94, § 903(c), 133 Stat. 2534, 3082, the statute on which the plaintiffs relied to allege personal jurisdiction over the defendants. The PSJVTA specifically provides that the PLO and the PA "shall be deemed to have consented to personal jurisdiction" in any civil action pursuant to the Anti-Terrorism Act, 18 U.S.C. § 2333, irrespective of "the date of the occurrence of the act of international terrorism" at issue, upon engaging in certain forms of post-enactment conduct, namely (1) making payments, directly or indirectly, to the designees or families of incarcerated or deceased terrorists, respectively, whose acts of terror injured or killed a United States national, or (2) undertaking any activities within the United States, subject to a handful of exceptions. Id. § 2334(e). We conclude that the PSJVTA's "deemed consent" provision is inconsistent with the dictates of the Fifth Amendment's Due Process Clause. Accordingly, we **AFFIRM** the judgment of the district court.

---

ALLON KEDEM, Arnold & Porter Kaye Scholer LLP, Washington, D.C. (Kent A. Yalowitz, Avishai D. Don, David C. Russell, Arnold & Porter Kaye Scholer LLP, New York, NY, Dirk C. Phillips, Stephen K. Wirth, Arnold & Porter Kaye Scholer LLP, Washington, D.C., Jeffrey Fleischmann, The Law Office of Jeffrey Fleischmann, P.C., New York, NY, Samuel Silverman,

---

[**] Judge John G. Koeltl, of the United States District Court for the Southern District of New York, sitting by designation.

2

## Add. 3

The Silverman Law Firm PLLC, New City, NY, *on the brief), for Plaintiffs-Appellants.*

MITCHELL R. BERGER, Squire Patton Boggs (US) LLP, Washington, D.C. (Gassan A. Baloul, Squire Patton Boggs (US) LLP, Washington, D.C., *on the brief), for Defendants-Appellees.*

BENJAMIN H. TORRANCE, Assistant United States Attorney, Of Counsel *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY (Brian M. Boynton, Principal Deputy Assistant Attorney General, Sharon Swingle, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice, Washington, D.C., *on the brief), for Intervenor-Appellant United States of America.*

Tejinder Singh, Sparacino PLLC, Washington, D.C., *for Amici Curiae Abraham D. Sofaer and Louis J. Freeh in Support of Plaintiffs-Appellants and Intervenor-Appellant.*

J. Carl Cecere, Cecere PC, Dallas, TX, *for Amici Curiae Sen. Charles E. Grassley, Sen. Richard Blumenthal, Rep. Jerrold Nadler, Rep. Claudia Tenney, Rep. Bradley E. Schneider, Sen. James Lankford, Sen. Marco Rubio, Rep. Kathleen Rice, Rep. Lee Zeldin, Rep. Theodore Deutch, and Rep. Grace Meng in Support of Plaintiffs-Appellants and Intervenor-Appellant.*

Joshua E. Abraham, Abraham Esq. PLLC, New York, NY, *for Amici Curiae Constitutional Law Scholars Philip C. Bobbitt, Michael C. Dorf, and H. Jefferson Powell in Support of Plaintiffs-Appellants.*

---

3

# Add. 4

KOELTL, *District Judge*:

The plaintiffs, several family members of a United States citizen killed in an overseas terrorist attack, appeal from a judgment of the United States District Court for the Southern District of New York (Furman, <u>J.</u>) dismissing their claims against the Palestine Liberation Organization ("PLO") and the Palestinian Authority ("PA"). The district court dismissed those claims for lack of personal jurisdiction over the defendants. The Government, as intervenor in accordance with 28 U.S.C. § 2403(a) and Federal Rule of Civil Procedure 5.1(c), also appeals from the judgment.

At issue in this appeal is the constitutionality of the Promoting Security and Justice for Victims of Terrorism Act of 2019 ("PSJVTA"), Pub. L. No. 116-94, § 903(c), 133 Stat. 2534, 3082, the federal statute on which the plaintiffs relied to allege personal jurisdiction over the defendants. The PSJVTA was enacted for the precise purpose of preventing dismissals based on lack of personal jurisdiction in cases just like this one — civil actions against the PLO and the PA pursuant to the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, which provides a damages remedy for United States nationals injured "by reason of an act of international terrorism," <u>id.</u> § 2333(a).

4

**Add. 5**

Congress crafted the PSJVTA in response to a series of judicial decisions, all arising out of civil ATA cases related to terrorist activity abroad, which held that federal courts had no general or specific personal jurisdiction over the PLO and the PA. The resulting statute reflects a legislative effort to create personal jurisdiction over those entities based on alleged consent, which, when validly given, may constitute an independent constitutional basis for subjecting a nonresident defendant to litigation in a particular forum. The PSJVTA specifically provides that the PLO and the PA "shall be deemed to have consented to personal jurisdiction in [any] civil [ATA] action," irrespective of "the date of the occurrence of the act of international terrorism" at issue, upon engaging in certain forms of post-enactment conduct, namely (1) making payments, directly or indirectly, to the designees or families of incarcerated or deceased terrorists, respectively, whose acts of terror injured or killed a United States national, or (2) undertaking any activities within the United States, subject to a handful of exceptions. Id. § 2334(e).

The district court determined that this "deemed consent" provision was an unconstitutional attempt to create personal jurisdiction over the defendants where none existed, and it accordingly dismissed the plaintiffs' civil ATA action for lack

5

**Add. 6**

of personal jurisdiction pursuant to Federal Rule of Civil Procedure Rule 12(b)(2).

Both the plaintiffs and the Government (together, "appellants") challenge that

conclusion on appeal, arguing principally that the exercise of this "deemed

consent" jurisdiction under the PSJVTA satisfies the Fifth Amendment's Due

Process Clause.

  We conclude that the PSJVTA's provision for "deemed consent" to personal

jurisdiction is inconsistent with the requirements of constitutional due process.

Accordingly, we **AFFIRM** the district court's judgment dismissing this case.

## I. BACKGROUND

  The plaintiffs are the widowed spouse and children of Ari Yoel Fuld, a

United States citizen who was fatally stabbed during a September 2018 terrorist

attack outside a shopping mall in the West Bank. In the aftermath of Fuld's death,

the plaintiffs commenced this action against the PLO and the PA, alleging that

these defendants had "encouraged, incentivized, and assisted" the nonparty who

committed the attack on Fuld. Am. Compl. ¶ 4. The PA, established in 1993

pursuant to the Oslo Accords, is the non-sovereign and interim governing body of

parts of the Gaza Strip and the West Bank (collectively referred to here as

"Palestine"). The PLO, an entity founded in 1964, conducts Palestine's foreign

6

**Add. 7**

affairs and serves as a Permanent Observer to the United Nations ("UN") on behalf

of the Palestinian people. The plaintiffs seek monetary relief from both defendants

pursuant to the ATA, 18 U.S.C. § 2333, which, as relevant here, provides

United States nationals "injured . . . by reason of an act of international terrorism"

with a civil damages remedy against "any person who aids and abets, by

knowingly providing substantial assistance [to]," the perpetrator of the attack.

Id. § 2333(a), (d)(2).

Several years before these plaintiffs initiated their case, and prior to the

passage of the PSJVTA, this Court decided Waldman v. Palestine Liberation

Organization, 835 F.3d 317 (2d Cir. 2016) ("Waldman I"), cert denied sub nom.

Sokolow v. Palestine Liberation Organization, 138 S. Ct. 1438 (2018) (mem.), which

arose out of litigation involving civil ATA claims similar in key respects to those

asserted here.[1] The Waldman plaintiffs, a group of United States citizens injured

or killed during terror attacks in Israel and the estates or survivors of such citizens,

sued the PLO and the PA for money damages pursuant to the ATA, alleging that

the defendants had provided material support to the nonparties who carried out

---

[1] The procedural history of the Waldman litigation (captioned Sokolow v. Palestine
Liberation Organization, No. 04-cv-397 (S.D.N.Y.) in the district court) is set forth in
greater detail in Waldman v. Palestine Liberation Organization, ___ F.4th ___, No. 15-
3135 (2d Cir. Sept. 8, 2023) ("Waldman III") (per curiam), which we also decide today.

**Add. 8**

the attacks. After more than a decade of litigation and a substantial jury verdict in favor of the plaintiffs, the defendants filed their appeal in this Court, where they reasserted their longstanding objection that the claims against them should be dismissed for lack of personal jurisdiction.

This Court ultimately agreed with the defendants, concluding that dismissal was required because, notwithstanding the "unquestionably horrific" nature of the attacks underlying the plaintiffs' claims, "[t]he district court could not constitutionally exercise either general or specific personal jurisdiction over the defendants." Waldman I, 835 F.3d at 344. We explained, as a threshold matter, that while sovereign governments lack due process rights, "neither the PLO nor the PA is recognized by the United States as a sovereign state," and accordingly, both defendants are entitled to due process protections. Id. at 329. Moreover, we noted that our precedents established that the "due process analysis" in the personal jurisdiction context "is basically the same under both the Fifth and Fourteenth Amendments," except that "under the Fifth Amendment the court can consider the defendant's contacts throughout the United States, while under the Fourteenth Amendment only the contacts with the forum state may be considered." Id. at 330 (quoting Chew v. Dietrich, 143 F.3d 24, 28 n.4 (2d Cir. 1998)).

8

**Add. 9**

With these background principles in mind, we concluded that the district court lacked general personal jurisdiction over the defendants "pursuant to the Supreme Court's recent decision" in <u>Daimler AG v. Bauman</u>, 571 U.S. 117 (2014), because neither defendant's contacts with the forum were "so constant and pervasive as to render [it] essentially at home" in the United States. <u>Waldman I</u>, 835 F.3d at 331, 335 (quoting <u>Daimler</u>, 571 U.S. at 122). We rejected the notion that the defendants could be considered "essentially at home" in this country based on their activities in Washington, D.C., which were "limited to maintaining an office [there], promoting the Palestinian cause in speeches and media appearances, and retaining a lobbying firm." <u>Id.</u> at 333. Rather, both the PLO and the PA "are 'at home' in Palestine, where these entities are headquartered and from where they are directed." <u>Id.</u> at 334 (citing <u>Daimler</u>, 571 U.S. at 139 n.20).

This Court likewise held that the district court could not properly exercise specific personal jurisdiction over the PLO and the PA, in view of the absence of any "substantial connection" between "the defendants' suit-related conduct — their role in the six terror attacks at issue — [and] . . . the forum." <u>Id.</u> at 335 (citing <u>Walden v. Fiore</u>, 571 U.S. 277, 284 (2014)). We explained that the terrorist attacks themselves took place outside the United States, that "the defendants' [related]

9

**Add. 10**

activities in violation of the ATA occurred outside the United States," and that

none of these acts were "specifically targeted" or "expressly aimed" at the United

States. Id. at 335, 337–38. Indeed, the attacks in question were "random," such that

they "affected United States citizens only because [those citizens] were victims of

indiscriminate violence . . . abroad." Id. at 337. Thus, the actions for which the

defendants had been sued "were not sufficiently connected to the United States to

provide specific personal jurisdiction," and the "limits prescribed by

[constitutional] due process" required that the case be dismissed. Id. at 337, 344.

In a series of comparable cases, the United States Court of Appeals for the District

of Columbia Circuit reached the same conclusions. See Livnat v. Palestinian Auth.,

851 F.3d 45, 54–58 (D.C. Cir. 2017) (concluding, in a civil ATA case arising out of

overseas terror attacks, that exercising general or specific jurisdiction over the PA

would not "meet the requirements of the Fifth Amendment's Due Process

Clause"), cert. denied, 139 U.S. 373 (2018) (mem.); see also Shatsky v. Palestine

Liberation Org., 955 F.3d 1016, 1036–37 (D.C. Cir. 2020) (same as to both the PLO

and the PA); Est. of Klieman v. Palestinian Auth., 923 F.3d 1115, 1123–26 (D.C. Cir.

2019) ("Klieman") (same), judgment vacated on other grounds, 140 S. Ct. 2713

(2020) (mem.), opinion reinstated in part, 820 F. App'x 11 (D.C. Cir. 2020) (mem.).

**Add. 11**

Congress responded to <u>Waldman I</u> and similar decisions with federal legislation known as the Anti-Terrorism Clarification Act of 2018 ("ATCA"), Pub. L. No. 115-253, 132 Stat. 3183, which modified an existing ATA provision, 18 U.S.C. § 2334, to include a new subsection (e) concerning the "[c]onsent of certain parties to personal jurisdiction." <u>See</u> ATCA § 4, 132 Stat. at 3184. This new subsection provided that "regardless of the date of the occurrence of the act of international terrorism upon which [a] civil action [pursuant to the ATA] was filed," a defendant would "be deemed to have consented to personal jurisdiction in such civil action if," after more than 120 days following the ATCA's enactment, the defendant (1) "accept[ed]" certain "form[s] of assistance" from the United States, or (2) "maintain[ed]" an office "within the jurisdiction of the United States" while "benefiting from a waiver or suspension" of 22 U.S.C. § 5202, a statutory provision expressly barring the PLO from operating any such office. ATCA § 4, 132 Stat. at 3184.

Before the expiration of the 120-day period, both the PLO and the PA formally terminated their acceptance of any relevant assistance from the United States, and the PLO shuttered its diplomatic mission in Washington, D.C. — its

11

**Add. 12**

only office operating in the United States pursuant to a waiver of 22 U.S.C. § 2502.[2]

See Klieman, 923 F.3d at 1128–30.

This Court subsequently denied a motion to recall the mandate in

Waldman I based on the ATCA, because neither of the statute's "factual

predicates" for personal jurisdiction could be satisfied. Waldman v. Palestine

Liberation Org., 925 F.3d 570, 574–75 (2d Cir. 2019) ("Waldman II") (per curiam),

cert. granted, judgment vacated sub nom. Sokolow v. Palestine Liberation Org.,

140 S. Ct. 2714 (2020) (mem.). Around the same time, the D.C. Circuit Court of

Appeals made a similar finding. See Klieman, 923 F.3d at 1128 (dismissing ATA

---

[2] The PLO had previously maintained this Washington, D.C. office pursuant to an express waiver of 22 U.S.C. § 5202, which expired around the time of the office's closure. At that point, no waivers or suspensions of this provision remained in effect. See Klieman, 923 F.3d at 1130. The PLO has continued to operate its UN Permanent Observer Mission in New York, but it does so without any need for a waiver or suspension of 22 U.S.C. § 5202, which forbids the PLO from "maintain[ing] an office . . . within the jurisdiction of the United States." 22 U.S.C. § 5202(3); see Klieman, 923 F.3d at 1129–30. That statutory prohibition "does not apply . . . to the PLO's Mission in New York," because the PLO's UN office falls beyond the jurisdiction of the United States in light of the UN Headquarters Agreement. Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria, 937 F.2d 44, 46, 51 (2d Cir. 1991) ("[T]he PLO's participation in the UN is dependent on the legal fiction that the UN Headquarters is not really United States territory at all, but is rather neutral ground over which the United States has ceded control."); see also United States v. Palestine Liberation Org., 695 F. Supp. 1456, 1471 (S.D.N.Y. 1988) ("The PLO Mission to the United Nations is an invitee of the United Nations under the Headquarters Agreement and its status is protected by that agreement.").

**Add. 13**

claims against the PLO and the PA for lack of personal jurisdiction and explaining, in relevant part, that the ATCA's "factual predicates" had not been "triggered").

While petitions for writs of certiorari from <u>Waldman II</u> and <u>Klieman</u> were pending, Congress stepped in again, this time enacting the PSJVTA on December 20, 2019. <u>See</u> Pub. L. No. 116-94, § 903(c), 133 Stat. 2534, 3082 (2019). Section 903(c) of the PSJVTA superseded the relevant portions of the ATCA, resulting in various amendments to the personal jurisdiction provisions of 18 U.S.C. § 2334(e).[3] 133 Stat. at 3083–85. Those amendments included a narrowed definition of the term "defendant," which now refers exclusively to the PLO, the PA, and any "successor[s]" or "affiliate[s]" thereof. 18 U.S.C. § 2334(e)(5). In drafting the PSJVTA, Congress also specified new post-enactment conduct that would be "deemed" to constitute "consent" to personal jurisdiction in "any civil action" under the ATA, "regardless of the date of the occurrence of the act of international terrorism upon which such civil action was filed." <u>Id.</u> § 2334(e)(1).

---

[3] The PSJVTA also includes a number of additional provisions, but only the jurisdictional amendments of § 903(c) are at issue in this case. We do not pass on the constitutionality of any portion of the PSJVTA other than § 903(c). However, for purposes of clarity, this opinion refers to § 903(c) as the PSJVTA, which is consistent with the nomenclature used in the district court's decision and the parties' briefs on appeal.

13

**Add. 14**

As amended pursuant to the PSJVTA, 18 U.S.C. § 2334(e)(1) includes two subparagraphs that list the circumstances under which "a defendant shall be deemed to have consented to personal jurisdiction" in a civil ATA case. Subparagraph (A) provides, first, that a defendant "shall be deemed to have consented" to such jurisdiction if, "after . . . 120 days" following the enactment of the PSJVTA (that is, after April 18, 2020), the defendant "makes any payment, directly or indirectly":

> (i) to any payee designated by any individual who, after being fairly tried or pleading guilty, has been imprisoned for committing any act of terrorism that injured or killed a national of the United States, if such payment is made by reason of such imprisonment; or

> (ii) to any family member of any individual, following such individual's death while committing an act of terrorism that injured or killed a national of the United States, if such payment is made by reason of the death of such individual.

Id. § 2334(e)(1)(A). This subparagraph refers, in the words of other federal legislation on the subject, to a "practice of paying salaries to terrorists serving in Israeli prisons[] [and] to the families of deceased terrorists," Taylor Force Act, Pub. L. No. 115-141, § 1002, 132 Stat. 348, 1143 (2018), which Congress has previously condemned as "an incentive to commit acts of terror." Id.

14

**Add. 15**

Subparagraph (B) of the PSJVTA provides that "a defendant shall be deemed to have consented to personal jurisdiction" in a civil ATA action if, "after 15 days" following the PSJVTA's enactment (that is, after January 4, 2020), the defendant "continues to maintain," "establishes," or "procures any office, headquarters, premises, or other facilities or establishments in the United States," or otherwise "conducts any activity while physically present in the United States on behalf of the [PLO] or the [PA]." 18 U.S.C. § 2334(e)(1)(B). The PSJVTA exempts "certain activities and locations" from the reach of subparagraph (B), including facilities and activities devoted "exclusively [to] the purpose of conducting official business of the United Nations," id. § 2334(e)(3)(A)–(B), specified activities related to engagements with United States officials or legal representation, id. § 2334(e)(3)(C)–(E), and any "personal or official activities conducted ancillary to activities listed" in these exceptions, id. § 2334(e)(3)(F).

The PSJVTA includes a "rule[] of construction," which provides that the legislation's terms "should be liberally construed to carry out the purposes of Congress to provide relief for victims of terrorism." PSJVTA § 903(d)(1)(A), 133 Stat. at 3085. Congress also specified that the PSJVTA "shall apply to any case

15

**Add. 16**

pending on or after August 30, 2016," <u>id.</u> § 903(d)(2), 133 Stat. at 3085, referring to

the date just one day before this Court's decision in <u>Waldman I</u>.

On April 27, 2020, several months after the PSJVTA's enactment, the

Supreme Court granted certiorari in <u>Waldman II</u> and <u>Klieman</u>, vacated both

judgments, and remanded the cases "for further consideration in light of the

[PSJVTA]." <u>Sokolow</u>, 140 S. Ct. at 2714; <u>see</u> <u>Klieman</u>, 140 S. Ct. at 2713. Three days

later, on April 30, 2020, the plaintiffs commenced this action. The plaintiffs

invoked the PSJVTA as the sole basis for personal jurisdiction, and their amended

complaint alleged that both prongs of the statute's "deemed consent" provision

had been satisfied. With respect to the first prong, the plaintiffs alleged that, after

April 18, 2020, the defendants continued an existing practice of making payments

to (1) the designees of incarcerated terrorists who were fairly convicted of attacks

that killed or injured United States nationals, and (2) the families of deceased

terrorists who died while committing attacks that killed or injured United States

nationals. <u>See</u> 18 U.S.C. § 2334(e)(1)(A). For the second prong, the plaintiffs alleged

that, after January 4, 2020, the defendants (1) used an office maintained in the

United States, namely their UN Permanent Observer Mission in New York City,

for purposes other than official UN business, and (2) engaged in various activities

16

**Add. 17**

on their own behalf while in the United States, including providing consular services, holding press conferences, and publishing various online and print materials designed to influence American foreign policy. See id. § 2334(e)(1)(B).

The PLO and the PA moved to dismiss the plaintiffs' amended complaint for lack of personal jurisdiction and for failure to state a claim, pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), respectively. In connection with their Rule 12(b)(2) motion, the defendants challenged the constitutionality of the PSJVTA, arguing that the statute's provision for "deemed consent" to personal jurisdiction violated due process requirements. The district court certified this constitutional challenge to the United States Attorney General, and the Government intervened in the action to defend the PSJVTA. See 28 U.S.C. § 2403(a); Fed. R. Civ. P. 5.1.

In a January 6, 2022 decision, the district court granted the defendants' Rule 12(b)(2) motion to dismiss on the ground that it could not validly exercise personal jurisdiction under the PSJVTA's "deemed consent" provision. See Fuld v. Palestine Liberation Org., 578 F. Supp. 3d 577, 580, 596 (S.D.N.Y. 2022). The court noted at the outset that "a defendant's knowing and voluntary consent, whether express or implied," can serve as an "independent" basis for personal jurisdiction, separate

17

**Add. 18**

and apart from "general jurisdiction[] . . . [and] specific jurisdiction." <u>Id.</u> at 579.

Moreover, the court observed that the PLO and the PA did "not dispute" the

plaintiffs' allegation that they had made payments triggering the PSJVTA's first

"deemed consent" prong.[4] <u>Id.</u> at 583. Nevertheless, the district court concluded

that "deemed consent" under the PSJVTA could not "constitutionally provide for

personal jurisdiction over [the] [d]efendants." <u>Id.</u> at 587. The court reasoned that

the predicate activities under the PSJVTA do not "even remotely signal[] approval

or acceptance of," or an "inten[t] to submit to," jurisdiction in the United States,

<u>id.</u> (internal quotation marks omitted), that the statute "push[es] the concept of

consent well beyond its breaking point," <u>id.</u> at 595, and that "legislature[s] [cannot]

simply create [personal] jurisdiction out of whole cloth by deeming any conduct

[whatsoever] to be 'consent,'" <u>id.</u> at 580. In short, the district court concluded that

"deemed consent jurisdiction" under the PSJVTA is not "consistent with the

---

[4] The defendants did, however, "contest [the] [p]laintiffs' allegations that the PSJVTA's second 'deemed consent' prong ha[d] been met." <u>Fuld</u>, 578 F. Supp. 3d at 583 n.3. The defendants argued that to the extent they had conducted activities within the United States after the relevant post-enactment date, all of those activities fell within the exceptions for UN-related undertakings and "ancillary" conduct. 18 U.S.C. § 2334(e)(3). In light of its finding that "the PSJVTA's first prong ha[d] been met," the district court declined to consider "whether [the] [d]efendants' conduct also implicate[d] the second prong." <u>Fuld</u>, 578 F. Supp. 3d at 583 n.3. It is also unnecessary to address that question on this appeal.

**Add. 19**

requirements of due process," and accordingly, the action had to be dismissed for lack of personal jurisdiction. Id. (internal quotation marks omitted).

The district court entered final judgment on January 7, 2022. Both the plaintiffs and the Government timely appealed.

## II. DISCUSSION

We review the dismissal of a complaint for lack of personal jurisdiction de novo, construing the pleadings in the light most favorable to the plaintiffs and resolving all doubts in the plaintiffs' favor. V&A Collection, LLC v. Guzzini Props. Ltd., 46 F.4th 127, 131 (2d Cir. 2022). Likewise, we review de novo questions of law, including challenges to the constitutionality of a statute. United States v. Wasylyshyn, 979 F.3d 165, 172 (2d Cir. 2020).

"Before a court may exercise personal jurisdiction over a defendant, three requirements must be met: (1) 'the plaintiff's service of process upon the defendant must have been procedurally proper'; (2) 'there must be a statutory basis for personal jurisdiction that renders such service of process effective'; and (3) 'the exercise of personal jurisdiction must comport with constitutional due process principles.'" Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC, 22 F.4th 103, 121 (2d Cir. 2021) (quoting Waldman I, 835 F.3d at 327–28). In this case, the parties do not dispute that the first and second requirements were waived and

19

**Add. 20**

satisfied, respectively.[5] See Fuld, 578 F. Supp. 3d at 583. We therefore consider only the third requirement — "whether jurisdiction over the defendants may be exercised consistent with the Constitution." Waldman I, 835 F.3d at 328.

The principle that a court must have personal jurisdiction over a defendant "recognizes and protects an individual liberty interest" flowing from the Constitution's guarantees of due process. Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982). As we explained in Waldman I, that principle extends to both the PLO and the PA, each of whom enjoys a due process right "to be subject only to [a court's] lawful power." 835 F.3d at 328–29 (citing J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 884 (2011) (plurality opinion)). In particular, constitutional due process ensures that a court will exercise personal jurisdiction over a defendant only if "the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)). The Supreme Court's precedents discussing that requirement, including its canonical opinion in International Shoe, have arisen under the Due Process

---

[5] Specifically, the defendants "waived any defenses regarding proper service of process," and with respect to the second requirement, the defendants do not dispute that they "made payments" sufficient to satisfy the PSJVTA's first statutory prong for "deemed consent." Fuld, 578 F. Supp. 3d at 583.

20

**Add. 21**

Clause of the Fourteenth Amendment — a constraint on the power of state tribunals. See U.S. Const. amend. XIV, § 1; see also Int'l Shoe, 326 U.S. at 311. But we have previously explained that the personal jurisdiction analysis is "basically the same" under the Fifth Amendment's Due Process Clause, which limits the power of the federal courts and governs the inquiry here.[6] Waldman I, 835 F.3d at 330 (internal quotation marks omitted); see U.S. Const. amend. V.

The Supreme Court has recognized three distinct bases for exercising personal jurisdiction over an out-of-forum defendant in accordance with the dictates of due process: general jurisdiction, specific jurisdiction, and consent. See, e.g., Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472–73 & 472 n.14 (1985); J. McIntyre Mach., 564 U.S. at 880–81 (plurality opinion). The first two bases, "general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction," "giv[e] content" to the holding of International Shoe, which established that a court may hear claims against a defendant who has not submitted to its authority only where the defendant has certain "contacts"

———————————

[6] As noted above, the "principal difference" between these due process standards arises in the context of a minimum-contacts inquiry: the analysis under the Fourteenth Amendment is limited to the defendant's contacts with the forum state, while the Fifth Amendment permits consideration of the defendant's contacts with the United States as a whole. Waldman I, 835 F.3d at 330 (citing Chew, 143 F.3d at 28 n.4).

21

**Add. 22**

with the forum. <u>Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.</u>, 141 S. Ct. 1017, 1024

(2021); <u>see</u> <u>Goodyear Dunlop Tires Operations, S.A. v. Brown</u>, 564 U.S. 915, 923–

24 (2011); <u>Int'l Shoe</u>, 326 U.S. at 316. General jurisdiction, as its name suggests,

allows a court to hear "any and all claims" against a defendant — but, for

businesses and organizations, only when that defendant is "essentially at home"

in the forum. <u>Ford</u>, 141 S. Ct. at 1024 (quoting <u>Goodyear</u>, 564 U.S. at 919); <u>see</u>

<u>Daimler</u>, 571 U.S. at 127. Specific jurisdiction, in contrast, covers a "narrower class

of claims," <u>Ford</u>, 141 S. Ct. at 1024, and depends "on the relationship among the

defendant, the forum, and the litigation," <u>Walden</u>, 571 U.S. at 284 (internal

quotation marks omitted). In particular, a court may exercise specific jurisdiction

if the defendant has "purposefully avail[ed] itself of the privilege of conducting

activities within the forum," <u>Hanson v. Denckla</u>, 357 U.S. 235, 253 (1958), or if the

defendant has intentionally directed wrongdoing at the forum, <u>Calder v. Jones</u>,

465 U.S. 783, 790 (1984). Even then, the court's authority is limited solely to claims

that "arise out of or relate to" the defendant's forum contacts. <u>Ford</u>, 141 S. Ct. at

1025 (quoting <u>Bristol-Myers Squibb Co. v. Super. Ct. of Cal.</u>, 582 U.S. 255, 262

(2017)); <u>see</u> <u>Burger King</u>, 471 U.S. at 472–73.

**Add. 23**

Neither of those two bases for personal jurisdiction is at issue here. In the proceedings before the district court, the plaintiffs never argued for general or specific jurisdiction over the PLO and the PA. Nor do they contest the district court's conclusion that "[a]ny such argument would be foreclosed by . . . Waldman I." Fuld, 578 F. Supp. 3d at 584. Instead, the plaintiffs rely exclusively on consent, the third independent basis for exercising personal jurisdiction over an out-of-forum defendant. See Ins. Corp. of Ireland, 456 U.S. at 703; Burger King, 471 U.S. at 472 & n.14. The plaintiffs contend that the PLO and the PA are deemed to have consented to personal jurisdiction in this civil ATA action pursuant to the PSJVTA, because engaging in the statute's predicate conduct amounts to "implied" or "constructive" consent. See, e.g., Pls.' Br. at 13. Both the plaintiffs and the Government argue that the PSJVTA establishes consent-based jurisdiction in accordance with due process principles, and that the district court erred in holding otherwise.

We disagree. For the reasons set forth below, we conclude that the PSJVTA's "deemed consent" provision is inconsistent with the Due Process Clause of the Fifth Amendment. Because the statute does not establish a federal court's authority over the PLO and the PA consistent with the Fifth Amendment's

**Add. 24**

requirement of due process, this case against those defendants was properly

dismissed for lack of personal jurisdiction.

**A.**

Consent to personal jurisdiction is a voluntary agreement on the part of a

defendant to proceed in a particular forum. See Nat'l Equip. Rental, Ltd. v.

Szukhent, 375 U.S. 311, 316 (1964) (a defendant "may agree . . . to submit to the

jurisdiction of a given court"); J. McIntyre Mach., 564 U.S. at 880–81 (plurality

opinion) ("explicit consent" is among the "circumstances, or . . . course[s] of

conduct, from which it is proper to infer . . . an intention to submit to the laws of

the forum"); Knowlton v. Allied Van Lines, Inc., 900 F.2d 1196, 1199 (8th Cir. 1990)

("A defendant may voluntarily consent or submit to the jurisdiction of a court

which otherwise would not have jurisdiction over it."). In several of its decisions,

including, most recently, Mallory v. Norfolk Southern Railway Co., 143 S. Ct. 2028

(2023), the Supreme Court has explained why such consent suffices to establish

personal jurisdiction: "Because the [due process] requirement of personal

jurisdiction [is] first of all an individual right, it can, like other such rights, be

waived." Ins. Corp. of Ireland, 456 U.S. at 703; see Burger King, 471 U.S. at 472 n.14

("[T]he personal jurisdiction requirement is a waivable right[.]"); Mallory, 143 S.

24

**Add. 25**

Ct. at 2043 (plurality opinion) ("[P]ersonal jurisdiction is a <u>personal</u> defense that may be waived or forfeited." (emphasis in original)); <u>id.</u> at 2051 (Alito, J., concurring in part and concurring in the judgment) ("If a person voluntarily waives th[e] [personal jurisdiction] right, that choice should be honored."). Thus, when a defendant has validly consented to personal jurisdiction, a court may exercise authority over that defendant in conformity with the Due Process Clause, even in the absence of general or specific jurisdiction. <u>See, e.g.</u>, <u>Mallory</u>, 143 S. Ct. at 2039 (plurality opinion) (explaining that "consent can . . . ground personal jurisdiction" apart from a defendant's forum contacts (internal quotation marks omitted)); <u>see also</u> <u>Knowlton</u>, 900 F.2d at 1199.

The Supreme Court has recognized a "variety of legal arrangements [that] have been taken to represent express or implied consent" to personal jurisdiction consistent with due process. <u>Ins. Corp. of Ireland</u>, 456 U.S. at 703; <u>see</u> <u>Mallory</u>, 143 S. Ct. at 2038 n.5 (majority opinion). For example, a defendant's consent to personal jurisdiction may be implied based on litigation-related conduct, or where a defendant accepts a benefit from the forum in exchange for its amenability to suit in the forum's courts. <u>See, e.g.</u>, <u>Ins. Corp. of Ireland</u>, 456 U.S. at 703–05; <u>Mallory</u>, 143 S. Ct. at 2033 (majority opinion); <u>id.</u> at 2041 n.8 (plurality opinion). In such

25

**Add. 26**

cases, it is often fair and reasonable to infer the defendant's voluntary agreement to submit itself to a court's authority. But consent cannot be found based solely on a government decree pronouncing that activities unrelated to being sued in the forum will be "deemed" to be "consent" to jurisdiction there. 18 U.S.C. § 2334(e)(1); cf. Ins. Corp. of Ireland, 456 U.S. at 705 (distinguishing between litigation-related conduct that establishes personal jurisdiction and "mere assertions of . . . power" over a defendant (quoting Chicago Life Ins. Co. v. Cherry, 244 U.S. 25, 29 (1917))). A prospective defendant's activities do not signify consent to personal jurisdiction simply because Congress has labeled them as such.

Thus, while "[a] variety of legal arrangements . . . [may] represent . . . consent to . . . personal jurisdiction," id. at 703, the PSJVTA is not among them. The PSJVTA's provision for consent-based jurisdiction over the PLO and the PA, in which Congress has "deemed" the continuation of certain conduct to constitute "consent," falls outside any reasonable construction of valid consent to proceed in a particular forum's courts.

**1.**

We begin with some of the "various ways" in which "consent may be manifested," either "by word or [by] deed." Mallory, 143 S. Ct. at 2039 (plurality

26

**Add. 27**

opinion). It is well-established that a defendant may expressly consent to personal jurisdiction in a particular court by contract, usually through an agreed-upon forum-selection clause. See Ins. Corp. of Ireland, 456 U.S. at 703–04; see also Szukhent, 375 U.S. at 316 ("[P]arties to a contract may agree in advance to submit to the jurisdiction of a given court."). So long as such "forum-selection provisions have been obtained through 'freely negotiated' agreements and are not 'unreasonable and unjust,' their enforcement [against a defendant] does not offend due process." Burger King, 471 U.S. at 472 n.14 (quoting Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972)); see also Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 595 (1991) ("[F]orum selection clauses . . . are subject to judicial scrutiny for fundamental fairness."). Likewise, a court may exercise authority over a defendant on the basis of express consent provided in a stipulation. See Ins. Corp. of Ireland, 456 U.S. at 704; Petrowski v. Hawkeye-Sec. Co., 350 U.S. 495, 496 (1956) (per curiam) ("[The] respondent, by its stipulation, waived any right to assert a lack of personal jurisdiction over it.").

The Supreme Court has acknowledged that a defendant may, in certain circumstances, impliedly consent to personal jurisdiction through litigation-related conduct. See, e.g., Ins. Corp. of Ireland, 456 U.S. at 703–05. Such conduct

**Add. 28**

includes a defendant's voluntary in-court appearance, see id. at 703, unless the defendant has appeared for the limited purpose of contesting personal jurisdiction (in which case, the defendant typically preserves the defense), see Mallory, 143 S. Ct. at 2044 (plurality opinion). Moreover, in keeping with the principle that "[t]he expression of legal rights is often subject to certain procedural rules," a defendant's "failure to follow [such] rules" with regard to personal jurisdiction may "result in a curtailment of [its] right[]" to enforce that requirement. Ins. Corp. of Ireland, 456 U.S. at 705. "Thus, the failure to enter a timely objection to personal jurisdiction constitutes, under Rule 12(h)(1), a waiver of the objection." Id. Similarly, a defendant's failure to comply with certain pretrial orders concerning jurisdictional discovery may justify a "sanction under Rule 37(b)(2)(A) consisting of a finding of personal jurisdiction." Id. The Supreme Court has found that other litigation activities can subject a litigant to personal jurisdiction as well. See, e.g., id. at 704; Leman v. Krentler-Arnold Hinge Last Co., 284 U.S. 448, 451 (1932).[7]

---

[7] Among these other examples, the only instances in which findings of "implied consent" have been premised on a defendant's omission are those where the defendant "fail[ed] to follow" litigation rules and orders related to personal jurisdiction, Ins. Corp. of Ireland, 456 U.S. at 703, 705, and thereby "forfeited" — rather than waived — the defense. See, e.g., City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 133–34, 135 (2d Cir. 2011) ("Personal jurisdiction . . . can . . . be purposely waived or inadvertently forfeited. . . . [A] defendant forfeits its jurisdictional defense if it appears before a district court to press that defense but then willfully withdraws from the litigation and defaults[.]");

**Add. 29**

The Supreme Court has also recognized that a prospective defendant may

be subject to personal jurisdiction if it has accepted a government benefit from the

forum, in return for which the defendant is required to submit itself to suit in the

forum. See Mallory, 143 S. Ct. at 2044 (plurality opinion) (explaining that personal

jurisdiction may exist where the defendant has "accept[ed] an in-state benefit with

jurisdictional strings attached"). The Supreme Court's recent decision in Mallory

highlighted such an arrangement: Mallory approved the exercise of consent-based

jurisdiction pursuant to a state business registration statute that "require[d] an

out-of-state firm to answer any suits against it in exchange for status as a registered

---

Hamilton v. Atlas Turner, Inc., 197 F.3d 58, 61–62 (2d Cir. 1999) ("Whereas forfeiture is
the failure to make the timely assertion of a right, waiver is the intentional relinquishment
or abandonment of a known right. . . . [The defendant] participated in pretrial
proceedings but never moved to dismiss for lack of personal jurisdiction despite several
clear opportunities to do so during the four-year interval after filing its answer. These
circumstances establish a forfeiture." (internal quotation marks and citations omitted)). It
can be said that in failing to follow such rules or orders, a defendant effectively concedes
the issue. See Ins. Corp. of Ireland, 456 U.S. at 705, 709 (where noncompliance with
litigation rules and orders supports a "presumption of fact" as to the "want of merit in
the asserted [personal jurisdiction] defense," "[t]he preservation of due process [is]
secured" (quoting Hammond Packing Co. v. Arkansas, 212 U.S. 322, 350–51 (1909))).
While forfeiture of a personal jurisdiction defense may be the product of mistake or
inadvertence, rather than affirmative conduct evincing agreement, the Supreme Court
has counted such forfeitures among the "legal arrangements [that] have been taken to
represent . . . implied consent to . . . personal jurisdiction." Id. at 703. But beyond these
forfeitures in the context of litigation, the existing precedent suggests that the conduct
necessary to support an inference of implied consent, whether related to the litigation or
not, must be some "intentional[]" act that can reasonably be construed as a waiver of the
personal jurisdiction requirement. Id. at 704.

**Add. 30**

foreign corporation and the benefits that entails." <u>Id.</u> at 2033 (majority opinion). A

plurality of the Justices noted that this sort of "exchange" between the defendant

and the forum — in other words, "consent to suit in exchange for access to a State's

markets" — "can signal consent to jurisdiction" in at least some cases. <u>Id.</u> at 2041

n.8 (plurality opinion) (alterations adopted).

      The litigation-related activities or reciprocal bargains described above, just

like "explicit consent," can supply a basis "from which it is proper to infer . . . an

intention to submit" to the forum, <u>J. McIntyre Mach.</u>, 564 U.S. at 880–81 (plurality

opinion), or are otherwise "of such a nature as to justify the fiction" of consent to

a court's authority, <u>Int'l Shoe</u>, 326 U.S. at 318; <u>see also</u> <u>Ins. Corp. of Ireland</u>, 456

U.S. at 705 (explaining, with regard to litigation conduct, that "due process [is]

secured" where the conduct supports a "presumption of fact" as to the existence

of personal jurisdiction). Under such circumstances, the assertion of consent-based

personal jurisdiction does "not offend traditional notions of fair play and

substantial justice," and is therefore consistent with constitutional due process.

<u>Ins. Corp. of Ireland</u>, 456 U.S. at 702–03 (quoting <u>Int'l Shoe</u>, 326 U.S. at 316).

**Add. 31**

**2.**

The appellants argue that the PSJVTA's "deemed consent" provision subjects the PLO and the PA to personal jurisdiction in a manner consistent with due process limits. But the statute's terms are insufficient to establish the defendants' valid consent, either express or implied, to waive their constitutional right not to be sued in a court that lacks personal jurisdiction over them.

It is undisputed that this case does not involve a defendant's express consent in any form — and for that reason, the plaintiffs' argument that a finding of consent "follows a fortiori from" Carnival Cruise is misplaced. See Pls.' Br. at 12–13, 28–29. In that case, the Supreme Court held that a specific forum-selection clause in a cruise ticket was enforceable against the parties who had assented to the agreement at issue. See Carnival Cruise, 499 U.S. at 587–89. The decision in Carnival Cruise did not "infer[] consent" at all, see Pls.' Br. at 27–29, but instead enforced the express jurisdiction-conferring language of a contract after accounting for considerations of notice and fundamental fairness.[8] See Carnival Cruise, 499 U.S. at 593–95.

---

[8] The plaintiffs also rely on Szukhent, 375 U.S. 311. But Szukhent concerned the validity under the Federal Rules of Civil Procedure of a contract provision that expressly appointed an agent for service of process. Id. at 315. As in Carnival Cruise, Szukhent enforced the express terms of a contract. No express contract is at issue here.

31

**Add. 32**

The appellants characterize the PSJVTA as establishing implied consent, but the statute provides no basis for a finding that the defendants have agreed to submit to the jurisdiction of the United States courts. The PSJVTA does not purport to determine that any litigation-related conduct on the part of the PLO or the PA constitutes implied consent to jurisdiction. Nor does the PSJVTA require submission to the federal courts' jurisdiction in exchange for, or as a condition of, receiving some in-forum benefit or privilege. Instead, Congress selected certain non-litigation activities in which the PLO and the PA had already engaged (or were alleged to have engaged) and decreed that those activities, if continued or resumed after a certain date, "shall be deemed" to constitute "consent[] to personal jurisdiction." 18 U.S.C. § 2334(e)(1); <u>see, e.g.</u>, <u>Klieman</u>, 923 F.3d at 1123–24, 1127, 1129–30 (describing allegations of PLO and PA activity in the United States); Taylor Force Act § 1002, 132 Stat. at 1143 (discussing the relevant payments). The defendants' support for terrorism not targeted at the United States and their limited activities within the United States have already been found to be insufficient to establish general or specific jurisdiction over the PLO and the PA in similar ATA cases, <u>see, e.g.</u>, <u>Waldman I</u>, 835 F.3d at 339–42, and those same activities cannot reasonably be interpreted as signaling the defendants' "intention

32

**Add. 33**

to submit" to the authority of the United States courts, see J. McIntyre Mach., 564 U.S. at 881 (plurality opinion). Rather, such activities allegedly constitute "consent" under the PSJVTA only because Congress has labeled them that way. Thus, under the statute, the defendants incur a jurisdictional penalty for the continuation of conduct that they were known to partake in before the PSJVTA's enactment — conduct which, on its own, cannot support a fair and reasonable inference of the defendants' voluntary agreement to proceed in a federal forum. This declaration of purported consent, predicated on conduct lacking any of the indicia of valid consent previously recognized in the case law, fails to satisfy constitutional due process.

Pursuant to the PSJVTA's first prong, the PLO and the PA "shall be deemed to have consented to personal jurisdiction" for "mak[ing] any payment" to the designees of incarcerated terrorists, or to the families of deceased terrorists, whose acts of terror "injured or killed a national of the United States." 18 U.S.C. § 2334(e)(1)(A). This specific non-litigation conduct cannot reasonably be understood as signaling the defendants' agreement to submit to the United States courts. Accordingly, the effect of the first prong is to subject the defendants to a jurisdictional sanction — "deemed consent" to the federal courts' authority — for

33

**Add. 34**

continuing to make the payments at issue. Illustrating the point, the appellants themselves repeatedly emphasize that the PSJVTA's first prong serves to deter a congressionally disfavored activity. See, e.g., Pls.' Br. at 11 (the first prong "incentivizes [the] [d]efendants to halt the universally condemned practice of making [the] payments" at issue); Intervenor Br. at 25–26 (the first prong "discourage[s]" payments that Congress has linked to terrorist activity). But Congress has a variety of other tools at its disposal for discouraging the payments in question. See, e.g., 22 U.S.C. § 2378c-1(a)(1)(B) (barring certain U.S. foreign aid that "directly benefits" the PA until both the PLO and the PA have "terminated" the relevant payments). Imposing consent to personal jurisdiction as a consequence for those payments, and thereby divesting the defendants of their Fifth Amendment liberty interest, is not among them.

The second prong of the PSJVTA similarly specifies predicate conduct that does not evince the defendants' agreement to subject themselves to the jurisdiction of the United States courts. This prong provides that the PLO and the PA "shall be deemed to have consented to personal jurisdiction" for "maintain[ing] any office" or "conduct[ing] any activity while physically present in the United States," with a limited set of exceptions. 18 U.S.C. § 2334(e)(1)(B). The appellants repeatedly

34

**Add. 35**

suggest that this prong is consistent with relevant precedents because it "[c]ondition[s] permission" for the defendants to engage in such activities, and to receive the attendant benefits of doing so, "on their consent to personal jurisdiction in ATA actions." Intervenor Br. at 24; see Pls.' Br. at 48 (the defendants' "receipt of [certain] benefits" is "condition[ed] . . . on their consent"). But this characterization is inaccurate, given that the statute does not provide the PLO or the PA with any such benefit or permission. With the exception of UN-related conduct and offices, which are protected pursuant to international treaty (and which, as set forth in 18 U.S.C. § 2334(e)(3), are exempt from the PSJVTA's second prong), federal law has long prohibited the defendants from engaging in any activities or maintaining any offices in the United States, absent specific executive or statutory waivers.[9] See,

---

[9] For example, the Anti-Terrorism Act of 1987 imposes a "wide gauged restriction of PLO activity within the United States [that], depending on the nature of its enforcement, could effectively curtail any PLO activities in the United States, aside from the Mission to the United Nations." Palestine Liberation Org., 695 F. Supp. at 1471; accord Klinghoffer, 937 F.2d at 51 ("[W]ere the PLO not a permanent observer at the UN, it would not be entitled to enter New York at all."); see Anti-Terrorism Act of 1987, Pub. L. 100-204, tit. X, §§ 1002–1005, 101 Stat. 1331, 1406–1407 (codified at 22 U.S.C. §§ 5201–5203) (stating Congress's "determin[ation] that the PLO and its affiliates are a terrorist organization . . . and should not benefit from operating in the United States," 22 U.S.C. § 5201(b), and prohibiting various activities related to the PLO, including "expend[ing] [PLO] funds," id. § 5202). Similar restrictions apply to the PA. See, e.g., Palestinian Anti-Terrorism Act of 2006 ("PATA"), Pub. L. No. 109-446, § 7(a), 120 Stat. 3318, 3324 (codified at 22 U.S.C. § 2378b note) (barring the PA from "establish[ing] or maintain[ing] an office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States" absent a specified certification). The Government acknowledges that these restrictions

35

**Add. 36**

e.g., Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille

Lauro in Amministrazione Straordinaria, 937 F.2d 44, 46, 51 (2d Cir. 1991)

(explaining that "the PLO is prohibited from engaging in any activities in this

country other than the maintenance of a mission to the UN"). The PSJVTA does

not purport to relax or override these prohibitions, and the appellants have not

identified any other change in existing law (for example, a statutory or executive

waiver) that would otherwise authorize the restricted conduct. Thus, the statute's

second prong cannot reasonably be construed as requiring a defendant's consent

to jurisdiction in exchange for permission to engage in the predicate activities,

because the defendants have not been granted permission to engage in those

activities at all.[10] Instead, the second prong exacts "deemed" consent as a price to

───────────────

can be lifted or relaxed only through the execution of formal waivers or suspensions under statutorily required procedures. See Intervenor Br. at 24–25 (citing relevant waiver provisions); see also Klieman, 923 F.3d at 1129–31 (describing the "formal . . . waiver procedure" applicable to 22 U.S.C. § 5202).

[10] The appellants do not dispute that the defendants are statutorily barred from conducting activities in the United States. Rather, the plaintiffs suggest that the Government has historically permitted certain activities as "a matter of grace," thereby allowing the Government to require consent in return. Pls.' Reply Br. at 25. But the Government retains the authority to enforce the relevant prohibitions and could exercise it at any time. See 22 U.S.C. § 5203 (authorizing the Attorney General to take any "necessary steps," including "legal action," to enforce the restrictions as to the PLO); PATA § 7(b), 120 Stat. at 3324 (same as to the PA). Turning a blind eye to prohibited conduct that remains subject to sanction or curtailment is not the same as authorizing such conduct. Cf. Klieman, 923 F.3d at 1131 (rejecting an attempt to "equate [a]

**Add. 37**

be paid upon "conduct[ing] [such] activit[ies]," 18 U.S.C. § 2334(e)(1)(B), without

conferring any rights or benefits on the defendants in return.

The appellants argue that the PSJVTA is constitutionally sound because it

gives the defendants "fair warning" of the relevant jurisdiction-triggering conduct

and "reasonably advances legitimate government interests in the context of our

federal system." Pls.' Br. at 11. They derive this standard from a variety of cases

describing basic principles of due process, including the Supreme Court's

decisions on specific jurisdiction in <u>Ford Motor Co.</u>, 141 S. Ct. 1017, and <u>Burger

King</u>, 471 U.S. 462. However, the concepts of "fair warning" and "legitimate

government interests" establish only minimum due process requirements. These

generalizations about due process do not resolve the precise issue in this case,

which is whether the defendants have consented to suit in the absence of general

or specific jurisdiction. None of the cases on which the appellants rely to support

their broad due process test purported to answer that question.[11]

---

government 'failure to prosecute'" certain activities under 22 U.S.C. § 5202 with the
"waiver or suspension" of the restrictions of those activities, for purposes of an analysis
under the ATCA).

[11] The plaintiffs also argue that the district court's analysis was flawed because it referred
to the right at issue here, the due process right not to be haled into a forum lacking
personal jurisdiction, as a "fundamental constitutional right." <u>See</u> <u>Fuld</u>, 578 F. Supp. 3d
at 580, 591. The Supreme Court has recognized that "certain fundamental rights" trigger
"heightened" scrutiny, <u>Washington v. Glucksberg</u>, 521 U.S. 702, 720 (1997), and

**Add. 38**

Tellingly, the appellants have cited no case implying consent to personal jurisdiction under circumstances similar to those in this action. Instead, all of the appellants' authorities concerning such implied consent involved a defendant's litigation-related conduct, or a defendant's acceptance of some in-forum benefit conditioned on amenability to suit in the forum's courts. Those cases premised consent on activities from which it was reasonable to infer a defendant's submission to personal jurisdiction, but that is not the situation here.

For example, in <u>Insurance Corporation of Ireland</u>, a decision that the appellants have relied on extensively, a defendant appeared before the district court to assert a personal jurisdiction defense, but then repeatedly failed to comply with discovery orders "directed at establishing jurisdictional facts" related to its contacts with the forum. 456 U.S. at 695; <u>see</u> <u>id.</u> at 698–99. The district court accordingly imposed a discovery sanction pursuant to Federal Rule of Civil Procedure 37(b)(2)(A), which provides that certain facts may "be taken as established" when a party "fails to obey a[] [discovery] order" concerning those

---

accordingly, the plaintiffs suggest that the district court must have applied an unduly strict standard in this case. These arguments are without merit. The district court was plainly using the phrase "fundamental" in a colloquial sense, not as a formal classification or a term of art, and we see no indication that the district court applied an inappropriately rigorous standard of scrutiny.

**Add. 39**

facts. Fed. R. Civ. P. 37(b)(2)(A). Consistent with that Rule, the district court treated the nonresident defendant's forum contacts as having been proven, which in turn established personal jurisdiction. <u>See</u> <u>Ins. Corp. of Ireland</u>, 456 U.S. at 695, 699.

The Supreme Court rejected the defendant's argument that this discovery sanction violated due process. <u>Id.</u> at 696. Relying on its previous decision in <u>Hammond Packing Co. v. Arkansas</u>, 212 U.S. 322 (1909), the Supreme Court explained that the "preservation of due process was secured by the presumption that the refusal to produce evidence material to the administration of due process was but an admission of the want of merit in the asserted defense." <u>Ins. Corp. of Ireland</u>, 456 U.S. at 705 (quoting <u>Hammond Packing</u>, 212 U.S. at 350–51). In other words, the defendant's "failure to supply the requested information as to its contacts with [the forum]," after "[h]aving put the issue in question," could fairly be construed as a tacit acknowledgment that the sought-after facts would establish personal jurisdiction. <u>Id.</u> at 709.

The current case bears no resemblance to <u>Insurance Corporation of Ireland</u>. In contrast to the "actions of the defendant" at issue there, <u>id.</u> at 704, the relevant conduct under the PSJVTA takes place entirely outside of the litigation. Moreover, the Supreme Court made clear that the application of the <u>Hammond Packing</u>

39

**Add. 40**

presumption in <u>Insurance Corporation of Ireland</u>, along with the exercise of personal jurisdiction that followed from it, was appropriate only because the defendant's litigation conduct related to whether personal jurisdiction existed. To underscore the point, the Supreme Court distinguished <u>Hovey v. Elliott</u>, 167 U.S. 409 (1897), which held that due process was violated where a court rendered judgment against a defendant "as 'punishment' for failure" to pay a certain fee — conduct plainly unrelated to any "asserted defense" in that case. <u>Ins. Corp. of Ireland</u>, 456 U.S. at 705–06. The effect of the PSJVTA is similar: the statute subjects the defendants to the authority of the federal courts for engaging in conduct with no connection to the establishment of personal jurisdiction, and indeed with no connection to litigation in the United States at all.

With respect to non-litigation conduct, the appellants rely heavily on cases finding consent to jurisdiction based on business registration statutes, which the plaintiffs described at oral argument as "no different" from the PSJVTA. However, the Supreme Court's recent decision in <u>Mallory</u> makes plain why those statutes are readily distinguishable. <u>Mallory</u> arose out of a Virginia resident's lawsuit in Pennsylvania state court against his former employer, a Virginia railroad corporation, for damages sustained as a result of work in Virginia and Ohio. <u>See</u>

**Add. 41**

143 S. Ct. at 2032–33. The plaintiff argued that the defendant had consented to personal jurisdiction in Pennsylvania when it registered as a foreign corporation under Pennsylvania law, which "requires out-of-state companies that register to do business in the [state] to agree to appear in its courts on 'any cause of action' against them." Id. at 2033 (quoting 42 Pa. Cons. Stat. § 5301(a)(2)(i), (b) (2019)); see also id. at 2037 (noting that the Pennsylvania statute "explicit[ly]" provides for general jurisdiction over registered foreign corporations). The defendant did not dispute that it had registered under the Pennsylvania statute, but it "resisted [the plaintiff's] suit on constitutional grounds," raising the question of "whether the Due Process Clause of the Fourteenth Amendment prohibits a State from requiring an out-of-state corporation to consent to personal jurisdiction to do business there." Id. at 2033.

The Supreme Court rejected this due process challenge and held that the defendant was subject to jurisdiction in Pennsylvania based on the state's business registration statute. See id. at 2032, 2037–38. The majority reasoned that the case fell "squarely within [the] rule" of Pennsylvania Fire Insurance Co. v. Gold Issue Mining & Milling Co., 243 U.S. 93 (1917), see Mallory, 143 S. Ct. at 2038, which, in the words of the plurality, established that the type of business registration statute

41

**Add. 42**

at issue "comport[s] with the Due Process Clause," <u>id.</u> at 2033 (plurality opinion).

<u>Pennsylvania Fire</u> specifically upheld the exercise of personal jurisdiction pursuant to a Missouri state law "requir[ing] any out-of-state insurance company desiring to transact any business in the State to . . . accept service on [a particular state] official as valid in any suit." <u>Id.</u> at 2036 (plurality opinion) (internal quotation marks omitted). In that case, "there was 'no doubt' [the out-of-state insurance company] could be sued in Missouri by an out-of-state plaintiff on an out-of-state contract," because the corporation "had agreed to accept service of process in Missouri on any suit as a condition of doing business there." <u>Id.</u> (plurality opinion) (quoting <u>Pennsylvania Fire</u>, 243 U.S. at 95).

That language — "as a condition of doing business there" — explains why the statutes at issue in both <u>Pennsylvania Fire</u> and <u>Mallory</u> could support a finding of implied consent to personal jurisdiction. Consent may be fairly inferred when a prospective defendant "voluntarily invoke[s] certain [in-forum] benefits . . . conditioned on submitting to the [forum's] jurisdiction," because the acceptance of the benefit implicitly signals the defendant's agreement to appear in the forum's courts. <u>Id.</u> at 2045 (Jackson, J., concurring). Put differently, a defendant may give its consent as part of a bargain: the defendant seeks and obtains a benefit that the

42

**Add. 43**

forum has to offer, and the defendant agrees to be sued in that jurisdiction in exchange. Thus, the statute at issue in <u>Mallory</u> supported a finding of consent to jurisdiction because it "gave the [defendant] the right to do business in-state in return for agreeing to answer any suit against it." 143 S. Ct. at 2041 (plurality opinion). Indeed, in discussing why such statutes count among the "legal arrangements [that] may represent . . . implied consent . . . consistent with due process," both the majority and the plurality referred repeatedly to this sort of "exchange."[12] <u>Id.</u> at 2044 n.10 (plurality opinion) (internal quotation marks omitted and alterations adopted); <u>see also</u> <u>id.</u> at 2044 (plurality opinion) ("[A]ccepting an in-state benefit with jurisdictional strings attached . . . can carry with [it] profound consequences for personal jurisdiction."). The plurality also stressed the fundamental fairness of <u>Mallory</u>'s outcome, given the scale of the

---

[12] <u>See, e.g.</u>, <u>Mallory</u>, 143 S. Ct. at 2041 n.8 (plurality opinion) ("[T]hese arrangements <u>can</u> include state laws requiring consent to suit in exchange for access to a State's markets." (internal quotation marks omitted and alterations adopted)); <u>see also</u> <u>id.</u> at 2033 (majority opinion) ("Pennsylvania law . . . requires an out-of-state firm to answer any suits against it in exchange for status as a registered foreign corporation and the benefits that entails."); <u>id.</u> at 2037 (majority opinion) (explaining that the registered defendant obtained "both the benefits and burdens shared by domestic corporations — including amenability to suit in state court on any claim," and that the defendant "has agreed to be found in Pennsylvania and answer any suit there"); <u>id.</u> at 2035 (plurality opinion) (describing a long history of state statutes "requiring out-of-state corporations to consent to in-state suits in exchange for the rights to exploit the local market and to receive the full range of benefits enjoyed by in-state corporations").

**Add. 44**

defendant's operations in the state. <u>See</u> <u>id.</u> at 2041–43. Because the defendant "had taken full advantage of its opportunity to do business" in the forum, the plurality found no due process concern in enforcing its consent to jurisdiction against it. <u>Id.</u> at 2041.

Mallory therefore underscores the lack of merit in the appellants' asserted analogy between the PSJVTA and business registration statutes. The PSJVTA does not require that the PLO and the PA consent to jurisdiction as a condition of securing a legal right to do business in the United States, which remains prohibited under current law, or to conduct any other presently unauthorized activity. Indeed, the statute does not offer <u>any</u> in-forum benefit, right, or privilege that the PLO and the PA could "voluntarily invoke" in exchange for their submission to the federal courts. <u>Mallory</u>, 143 S. Ct. at 2045 (Jackson, J., concurring). The defendants in this case cannot be said to have accepted some in-forum benefit in return for an agreement to be amenable to suit in the United States.[13]

---

[13] The plaintiffs contend that we would "break new ground" if we endorsed the "unprecedented" proposition that an in-forum benefit is required to establish a defendant's consent to jurisdiction based on non-litigation conduct. Pls.' July 26, 2023 Supp. Br. at 5, 6. But this argument misses the point. The receipt of a benefit from the forum is not a necessary prerequisite to a finding that a defendant has consented to personal jurisdiction there. Rather, as in <u>Mallory</u>, this sort of "arrangement[]" — that is, a defendant's voluntary acceptance of an in-forum benefit conditioned on amenability to suit — can suffice under the circumstances to "signal consent to jurisdiction." 143 S. Ct.

**Add. 45**

The appellants' other examples of consent statutes are distinguishable on the same grounds. For example, the plaintiffs point to the state law at issue in <u>Hess v. Pawloski</u>, 274 U.S. 352 (1927), which provided that a nonresident motorist's use of the public roads "shall be deemed equivalent" to appointing an agent for service of process in actions "growing out of any accident or collision in which said nonresident may be involved." <u>Id.</u> at 354 (internal quotation marks omitted). Such a statute conditions "the use of the highway," an in-state benefit from which states may "exclude" nonresidents, on the nonresident's "consent" to personal jurisdiction. <u>Id.</u> at 356–57. Indeed, the statute itself was phrased in those terms: it stated that "[t]he acceptance by a nonresident of the rights and privileges" associated with "operating a motor vehicle . . . on a public way in the [state]" would be a "signification of his agreement" to service. <u>Id.</u> at 354 (internal quotation marks omitted). The same logic applies to state statutes providing that state courts, in certain classes of cases, can exercise consent-based jurisdiction over nonresident officers and directors of a business incorporated under that state's laws. <u>See</u> Pls.'

––––––––––––––––

at 2041 n.8 (plurality opinion) (internal quotation marks omitted). In other words, such an exchange can serve as a proxy for consent, from which it may be reasonable and fair to infer an agreement to submit to the forum. There are other means of demonstrating consent, such as certain litigation-related conduct. <u>See, e.g.</u>, <u>Ins. Corp. of Ireland</u>, 456 U.S. 703–05. But "deemed consent," absent some exchange of benefits, has never been recognized as a means of valid consent to personal jurisdiction.

45

**Add. 46**

Br. at 29 (citing <u>Hazout v. Tsang Mun Ting</u>, 134 A.3d 274, 289 (Del. 2016)). In "accepting and holding" the position of officer or director, <u>Hazout</u>, 134 A.3d at 277, a "privilege" that carries with it "significant [state-law] benefits and protections," <u>id.</u> at 292 n.66 (quoting <u>Armstrong v. Pomerance</u>, 423 A.2d 174, 176 (Del. 1980)), a nonresident can be said to have signaled an agreement to the jurisdictional consequences.[14]

---

[14] Relying on other cases outside of the personal jurisdiction context, the plaintiffs compare the PSJVTA to "implied consent laws that require motorists . . . to consent to BAC [(blood alcohol content)] testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense." <u>Missouri v. McNeely</u>, 569 U.S. 141, 161 (2013) (plurality opinion); <u>see, e.g.</u>, <u>South Dakota v. Neville</u>, 459 U.S. 553, 559 (1983) (describing one such statute as "declar[ing] that any person operating a vehicle in [the state] is deemed to have consented to a chemical test of the alcoholic content of his blood if arrested for driving while intoxicated"). But these statutes, which implicate the Fourth Amendment's protections against unreasonable searches, <u>see</u> <u>McNeely</u>, 569 U.S. at 148–51, are distinguishable for a variety of reasons, including those set forth above with regard to <u>Mallory</u> and <u>Hess</u>. Like the service-of-process statute considered in <u>Hess</u>, the "implied consent laws" for suspected drunk drivers require a motorist's consent to a particular obligation (specifically, "cooperation with BAC testing") as "a condition of the privilege of driving on state roads." <u>Birchfield v. North Dakota</u>, 579 U.S. 438, 447–48 (2016); <u>see</u> <u>McNeely</u>, 569 U.S. at 161 (plurality opinion) (noting that "all 50 states" have adopted laws requiring drivers to consent to BAC testing "as a condition of operating a motor vehicle within the State"). That is very different from the statute at issue here, which does not condition the defendants' consent on any in-forum privilege at all.

Further, the Supreme Court has never actually upheld these so-called implied consent laws under a consent theory. Rather, the Court has assessed the constitutionality of these laws on a case-by-case basis, relying on the exigency exception to the probable cause and warrant requirements of the Fourth Amendment. <u>See</u> <u>Mitchell v. Wisconsin</u>, 139 S. Ct. 2525, 2532–33 (2019) ("But our decisions have not rested on the idea that these laws . . . create actual consent to all the searches they authorize."); <u>see also</u> <u>id.</u> at 2551 (Gorsuch, J., dissenting) (underscoring that the Supreme Court did not address whether

46

**Add. 47**

In short, when a potential defendant accepts a government benefit conditioned on submitting to suit in the forum, such conduct may fairly be understood as consent to jurisdiction there. The same is often true when a defendant engages in litigation conduct related to the existence of personal jurisdiction. But in the PSJVTA, Congress has simply declared that specific activities of the PLO and the PA — namely, certain payments made outside of the United States, and certain operations within the United States (which remain unlawful) — constitute "consent" to jurisdiction. No aspect of these allegedly jurisdiction-triggering activities can reasonably be interpreted as evincing the defendants' "intention to submit" to the United States courts. J. McIntyre, 564 U.S. at 881 (plurality opinion). Congress cannot, by legislative fiat, simply "deem" activities to be "consent" when the activities themselves cannot plausibly be construed as such. Cf. McDonald v. Mabee, 243 U.S. 90, 91 (1917) (noting that, in "exten[ding] . . . the means of acquiring [personal] jurisdiction," "great caution should be used not to let fiction deny the fair play that can be secured only by a pretty close adhesion to fact").

---

implied consent was sufficient to authorize the search). These cases, therefore, shed little light on when a constitutional right may be waived by implied consent.

**Add. 48**

Like the district court, we need not decide whether, "under different circumstances, Congress or a state legislature could constitutionally 'deem' certain conduct to be consent to personal jurisdiction." Fuld, 578 F. Supp. 3d at 587. But for such a statute to pass muster, "the predicate conduct would have to be a much closer proxy for actual consent than the predicate conduct at issue" here. Id. Because the PSJVTA's predicate activities cannot reasonably be understood as signifying the defendants' consent, the statute does not effect a valid waiver of the defendants' due process protection against the "coercive power" of a foreign forum's courts. Goodyear, 564 U.S. at 918; see Waldman I, 835 F.3d at 328, 329.

**B.**

Our conclusion also follows from College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board, 527 U.S. 666 (1999). That decision concerned a federal statute, the Trademark Remedy Clarification Act ("TRCA"), which provided that states would forgo their Eleventh Amendment immunity from federal Lanham Act litigation if they committed "any violation" of the Lanham Act's prohibitions on false and misleading advertising. Id. at 670 (quoting 15 U.S.C. § 1122(b)). As relevant here, the petitioner argued that a state could be said to have "'impliedly' or 'constructively' waived its immunity" upon engaging

48

**Add. 49**

in the relevant predicate conduct — namely, "the activities regulated by the Lanham Act" — after "being put on notice by the clear language of the TRCA that it would be subject to [suit] for doing so." Id. at 669, 676, 680.

The Supreme Court rejected that proposition. It concluded that even with "unambiguous[]" advance notice from Congress, a state's "voluntarily elect[ing] to engage in the federally regulated conduct" at issue would not suffice to render the state suable. Id. at 679–81. Such conduct, the Supreme Court explained, supplied no basis "to assume actual consent" to suit in federal court. Id. at 680. To hold otherwise would ignore the "fundamental difference between a State's expressing unequivocally that it waives its immunity" (in which case, one can "be certain that the State in fact consents to suit") and "Congress's expressing unequivocally its intention that if the State takes certain action it shall be deemed to have waived that immunity." Id. at 680–81. The decision explained:

> In the latter situation, the most that can be said with certainty is that the State has been put on notice that Congress intends to subject it to suits brought by individuals. That is very far from concluding that the State made an altogether voluntary decision to waive its immunity.

Id. at 681 (emphasis in original) (internal quotation marks omitted). The Supreme Court also saw no merit in the notion that a state could be "deemed to have constructively waived its sovereign immunity" simply because "the asserted basis

49

**Add. 50**

for [the] waiver [was] conduct that the State realistically could choose to abandon."

<u>Id.</u> at 679, 684. This fact, the decision noted, "ha[d] no bearing upon the voluntariness of the waiver." <u>Id.</u> at 684.

This reasoning underscores the unconstitutionality of the PSJVTA's "deemed consent" provision. The statute purports to extract consent to personal jurisdiction using the very same template that <u>College Savings Bank</u> condemned in the sovereign immunity context: it identifies activities that, in Congress's judgment, the PLO and the PA "realistically could choose to abandon," and it "express[es] unequivocally [Congress's] intention that if [either defendant] takes [those] action[s] it shall be deemed to have" consented to a federal court's authority. <u>Id.</u> at 681, 684. The appellants repeatedly contend that this statutory framework gives rise to constructive consent because the predicate conduct is itself "voluntary," and the defendants "knowing[ly]" continued such conduct with "notice" of the statute's terms. Pls.' Br. at 19–20; <u>see</u> Intervenor Br. at 2–3. But <u>College Savings Bank</u> rejected that precise theory of constructive consent, making clear that the ability to "abandon" the relevant predicate conduct "ha[s] no bearing upon the voluntariness of the [asserted] waiver." 527 U.S. at 684. Instead, as <u>College Savings Bank</u> explained with regard to the state respondent, "the most

50

**Add. 51**

that can be said" about the defendants here "is that [each] has been put on notice that Congress intends to subject it to [certain] suits" in federal court. Id. at 681. That is a "very far" cry from an "altogether voluntary decision" on the part of either defendant to submit to a court's jurisdiction. See id.

The appellants argue that the logic of College Savings Bank is inapplicable here because the decision concerned the "special context" of state sovereign immunity, where the standard for waiver is "particularly strict." Pls.' Br. at 30–31 (internal quotation marks omitted); see Coll. Sav. Bank, 527 U.S. at 675 (describing the "test for determining whether a State has waived its immunity" as a "stringent one" (internal quotation marks omitted)). But the relevant aspects of the Supreme Court's reasoning were not so cabined. To the contrary, the decision emphasized that "constructive consent is not a doctrine commonly associated with the surrender of constitutional rights," and it noted that constructive waivers like the one considered there — a close match for the sort of "deemed consent" at issue here — "are simply unheard of in the context of . . . constitutionally protected privileges." 527 U.S. at 681 (internal quotation marks omitted and alteration adopted). The Supreme Court illustrated this point with an analogy to an entirely different constitutional context:

**Add. 52**

 [I]magine if Congress amended the securities laws to provide with
unmistakable clarity that anyone committing fraud in connection
with the buying or selling of securities in interstate commerce would
not be entitled to a jury in any federal criminal prosecution of such
fraud. Would persons engaging in securities fraud after the adoption
of such an amendment be deemed to have "constructively waived"
their constitutionally protected rights to trial by jury in criminal
cases? After all, the trading of securities is not so vital an activity that
any one person's decision to trade cannot be regarded as a voluntary
choice. The answer, of course, is no. The classic description of an
effective waiver of a constitutional right is the intentional
relinquishment or abandonment of a known right or privilege.

Id. at 681–82 (internal quotation marks and citations omitted, alterations adopted).

This example was pertinent, the Supreme Court explained, because the

Eleventh Amendment privilege of "[s]tate sovereign immunity, no less than the

[Sixth Amendment] right to trial by jury in criminal cases, is constitutionally

protected." Id. at 682. The same is true with regard to the "due process right not

to be subjected to judgment in [a foreign forum's] courts," J. McIntyre Mach., 564

U.S. at 881 (plurality opinion), which, like the Sixth Amendment jury trial right, is

a "legal right protecting the individual," Ins. Corp. of Ireland, 456 U.S. at 704. The

plaintiffs nevertheless suggest that we should ignore the lessons of College

Savings Bank because its general statements regarding waivers of constitutional

rights are nonbinding "dicta." Pls.' Br. at 13, 30, 32. But "it does not at all follow

that we can cavalierly disregard" those statements. United States v. Bell, 524 F.2d

52

**Add. 53**

202, 206 (2d Cir. 1975). Even if Supreme Court dicta do not constitute established

law, we nonetheless accord deference to such dicta where, as here, no change has

occurred in the legal landscape. United States v. Harris, 838 F.3d 98, 107 (2d Cir.

2016) (citing Newdow v. Peterson, 753 F.3d 105, 108 n.3 (2d Cir. 2014)); Bell, 524

F.2d at 206 (noting that Supreme Court dicta "must be given considerable

weight"). That deference is especially warranted in this case, given the close

parallels between the PSJVTA and the statutory framework that College Savings

Bank rejected.

Indeed, the voluminous briefing in this case makes clear that the PSJVTA's

approach to deemed consent is "simply unheard of," Coll. Sav. Bank, 527 U.S. at

681, because those papers, while extensive, fail to identify a single case approving

a similar constructive waiver of the personal jurisdiction requirement. The briefs

instead rely entirely on personal jurisdiction cases that are inapposite or

distinguishable, for all of the reasons discussed above.

The appellants also cite various cases involving waivers of other

constitutional rights, but those cases do not support the constitutionality of the

"deemed consent" imposed in the PSJVTA. For example, in arguing that waiving

a constitutional right does not require any exchange of benefits, the appellants

**Add. 54**

point to <u>United States v. O'Brien</u>, 926 F.3d 57 (2d Cir. 2019). In <u>O'Brien</u>, however, the defendant had expressly consented to the warrantless searches of his properties, in writing, rendering that case a plainly inapt comparison on the question of constructive consent.[15] <u>Id.</u> at 77. The appellants' authorities concerning valid waivers of the Fifth Amendment privilege against self-incrimination are similarly far afield. <u>See</u> <u>Moran v. Burbine</u>, 475 U.S. 412 (1986); <u>Oregon v. Elstad</u>, 470 U.S. 298 (1985). The criminal suspects' actions in those cases, taken upon receiving clear and comprehensive warnings pursuant to <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), left "no doubt" (in <u>Moran</u>) or "no question" (in <u>Elstad</u>) that each had knowingly and voluntarily waived his Fifth Amendment protections. <u>See</u> <u>Moran</u>, 475 U.S. at 417–18, 421–22 (respondent executed "written form[s] acknowledging that he understood his [<u>Miranda</u>] right[s]," and then gave a free and uncoerced confession); <u>Elstad</u>, 470 U.S. at 314–15, 315 n.4 (respondent gave affirmative verbal responses confirming that he understood his <u>Miranda</u> rights, then provided a free and uncoerced description of his offense).

---

[15] The Supreme Court's decision in <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218 (1973), a case that the plaintiffs cited at oral argument, is likewise distinguishable because it focused on an instance of express consent — in particular, to the warrantless search of a vehicle. <u>See</u> <u>id.</u> at 220.

**Add. 55**

The PSJVTA also finds no support in the plaintiffs' cases concerning implied waivers of a litigant's right to proceed before an Article III court. <u>See</u> <u>Wellness Int'l Network, Ltd. v. Sharif</u>, 575 U.S. 665 (2015); <u>Roell v. Withrow</u>, 538 U.S. 580 (2003). In these decisions, the Supreme Court explained that such waivers could be fairly inferred based on specific litigation conduct, namely, "voluntarily appear[ing] to try [a] case before [a] non-Article III adjudicator" after "[being] made aware of the need for consent and the right to refuse it." <u>Wellness Int'l Network</u>, 575 U.S. at 685 (internal quotation marks omitted) (discussing implied consent to a bankruptcy judge's resolution of certain claims); <u>Roell</u>, 538 U.S. at 586 n.3, 591 (discussing implied consent to a magistrate judge's disposition of an action). Those authorities are unlike this case, where the defendants have not engaged in any conduct (litigation-related or otherwise) evincing an "intention of . . . submitting to the court's jurisdiction." <u>Roell</u>, 538 U.S. at 586 n.3 (internal quotation marks omitted).

In sum, Congress cannot take conduct otherwise insufficient to support an inference of consent, brand it as "consent," and then decree that a defendant, after some time has passed, is "deemed to have consented" to the loss of a due process right for engaging in that conduct. This unprecedented framework for consent-based jurisdiction, predicated on conduct that is not "of such a nature as to justify

55

**Add. 56**

the fiction" of consent, cannot be reconciled with "traditional notions of fair play and substantial justice." <u>Int'l Shoe</u>, 326 U.S. at 316, 318 (internal quotation marks omitted). Thus, the PSJVTA's "deemed consent" provision is incompatible with the Fifth Amendment's Due Process Clause.

**C.**

The appellants and their <u>amici</u> make various other arguments in support of the constitutionality of the PSJVTA and the exercise of personal jurisdiction in this case, none of which is persuasive.

The Government defends the constitutionality of the PSJVTA on the grounds that the predicate conduct at issue is "closely linked to the only claim for which personal jurisdiction is permitted, a civil ATA action concerning attacks on Americans." Intervenor Br. at 30. But the relevant question here is not whether the predicate conduct identified in the statute bears some relation to the activities proscribed under the ATA, or to Congress's interest in remediating the harms that flow from those activities. Rather, the question is whether such conduct demonstrates the defendants' valid consent to the authority of a United States court. No basis exists to conclude that it does.

56

**Add. 57**

Also unpersuasive is the Government's contention that Congress, in furtherance of an important legislative purpose, narrowly tailored the PSJVTA to establish jurisdiction over only the PLO, the PA, and their "successors or affiliates." Intervenor Br. at 24. Such singling out does not cure a constitutional deficiency. Where, as here, a statute impinges on constitutional rights, it cannot be salvaged on the basis that it violates the rights of only a handful of subjects.

Relatedly, the Government contends that this Court must defer to Congress's choices in crafting the PSJVTA because the statute is "centrally concerned with matters of foreign affairs," a realm in which the political branches enjoy "broad authority." Intervenor Br. at 27. Invalidating the statute, the Government argues, would frustrate legislative and executive efforts to give full effect to the ATA's civil liability provisions, which comprise part of the nation's "comprehensive legal response to international terrorism." Id. at 22–23 (internal quotation marks omitted). It is true, of course, that when "sensitive interests in national security and foreign affairs [are] at stake," the policy judgments of both Congress and the Executive are "entitled to significant weight." Holder v. Humanitarian Law Project, 561 U.S. 1, 36 (2010). But it is equally true that the Government's broad "foreign affairs power . . . , 'like every other governmental

**Add. 58**

power, must be exercised in subordination to the applicable provisions of the Constitution.'" Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 416 n.9 (2003) (quoting United States v. Curtiss-Wright Exp. Corp., 299 U.S. 304, 320 (1936)). Indeed, "[o]ur deference in matters of policy cannot . . . become abdication in matters of law," and "[o]ur respect for Congress's policy judgments . . . can never extend so far as to disavow restraints on federal power that the Constitution carefully constructed." Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 538 (2012).

Thus, a statute "cannot create personal jurisdiction where the Constitution forbids it." In re Terrorist Attacks on Sept. 11, 2001, 538 F.3d 71, 80 (2d Cir. 2008) (internal quotation marks omitted), abrogated on other grounds by Samantar v. Yousuf, 560 U.S. 305 (2010); accord Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co., 284 F.3d 1114, 1121 (9th Cir. 2002); Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 95 (D.C. Cir. 2002). Because the PSJVTA purports to provide consent-based jurisdiction in a manner at odds with constitutional due process, the statute cannot stand, notwithstanding the policy concerns that motivated its enactment. See Nat'l Fed'n of Indep. Bus., 567 U.S. at 538 ("[T]here can be no question that it is the responsibility of th[e] Court to enforce the limits on federal power by striking down acts of Congress that transgress those limits.").

58

**Add. 59**

The appellants also urge us to depart from our prior holding that the due process analyses under the Fifth and Fourteenth Amendments parallel one another in civil cases, see Waldman I, 835 F.3d at 330, and to embrace instead the view that the Fifth Amendment imposes comparatively looser requirements for the exercise of personal jurisdiction. For its part, the Government argues that Congress, as compared to state legislatures subject to the Fourteenth Amendment, should be permitted under the Fifth Amendment to authorize "a greater scope of personal jurisdiction" where it wishes to facilitate federal adjudication of certain "legal claims." Intervenor Br. at 39–40. As the basis for this position, the Government contends that the Supreme Court "has tied the limitations of its Fourteenth Amendment personal jurisdiction jurisprudence" to interstate federalism concerns, which do not similarly constrain the exercise of Congress's legislative power. Id. at 37–38. Under the Government's theory, the Fifth Amendment subjects Congress to a more lenient due process standard, allowing it to enact the sort of "deemed consent" provision featured in the PSJVTA — "[e]ven if," due to their limited sovereignty, "state[s] could not enact similar legislation consistent with the Fourteenth Amendment." Id. at 40.

**Add. 60**

The short answer to this argument is that the panel's opinion in <u>Waldman I</u> is the law of the Circuit and cannot be changed unless it is overruled by the Supreme Court or by this Court in an <u>en banc</u> or "mini-<u>en banc</u>" decision. <u>See United States v. Peguero</u>, 34 F.4th 143, 158 & n.9 (2d Cir. 2022). In any event, federalism is not the only constraint on the exercise of personal jurisdiction. <u>See Douglass v. Nippon Yusen Kabushiki Kaisha</u>, 46 F.4th 226, 235 (5th Cir. 2022) (en banc), <u>cert. denied sub nom.</u> <u>Douglass v. Kaisha</u>, 143 S. Ct. 1021 (2023) (mem.); <u>Livnat</u>, 851 F.3d at 55 ("[P]ersonal jurisdiction is not just about federalism."). Fundamentally, the Constitution's personal jurisdiction requirements represent a "restrict[ion] [on] judicial power" — and, as a corollary, a restriction on the legislative ability to expand that power — "not as a matter of sovereignty, but as a matter of individual liberty." <u>J. McIntyre Mach.</u>, 564 U.S. at 884 (plurality opinion) (quoting <u>Ins. Corp. of Ireland</u>, 456 U.S. at 702). Thus, to the extent that the need for personal jurisdiction operates as a limit on a state's sovereign authority, that effect "must be seen as ultimately a function of the individual liberty interest preserved by the Due Process Clause." <u>Ins. Corp. of Ireland</u>, 456 U.S. at 702 n.10. Relatedly, the Supreme Court's precedents make clear that one of the "vital purpose[s] of personal-jurisdiction standards," whether applied in state or federal

60

**Add. 61**

court, "is to ensure fairness to the defendant." <u>Livnat</u>, 851 F.3d at 55 (internal

quotation marks omitted and alteration adopted).

For these very reasons, several courts of appeals, including ours, have

rejected the notion that federalism's irrelevance in the Fifth Amendment context

justifies a "more lenient" standard for personal jurisdiction. <u>Waldman I</u>, 835 F.3d

at 329–30; <u>see, e.g.</u>, <u>Livnat</u>, 851 F.3d at 54–55; <u>see also</u> <u>Douglass</u>, 46 F.4th at 236–38

("Because the Due Process Clauses use the same language and guarantee

individual liberty in the same way, it makes sense that the standards developed in

the Fourteenth Amendment context must govern under the Fifth Amendment.").

No basis exists to conclude that the same argument, rooted in the absence of

federalism-related restrictions on national power, would warrant relaxing due

process constraints on Congress's ability to "deem[] certain actions . . . to be

consent to personal jurisdiction." Intervenor Br. at 40. Whether premised on

contacts or consent, subjecting a nonresident defendant to the power of a

particular forum implicates compelling concerns for fairness and individual

liberty, and those "strong justifications for personal-jurisdiction limits apply

equally in Fifth Amendment cases." <u>Livnat</u>, 851 F.3d at 55.[16]

---

[16] Moreover, "[j]urisdictional rules should be 'simple,' 'easily ascertainable,' and 'predictable.'" <u>Livnat</u>, 851 F.3d at 56 (alterations adopted) (quoting <u>Daimler</u>, 571 U.S. at

61

**Add. 62**

The plaintiffs take a somewhat different approach to this Fifth Amendment issue: they ask us to invoke our "'mini <u>en banc</u>' process," overrule <u>Waldman I</u> entirely, and embrace the broader Fifth Amendment standard used for personal jurisdiction in criminal cases, so that the district court may assert "specific jurisdiction" over the defendants irrespective of whether the PSJVTA gives rise to valid consent. Pls.' Br. at 16, 49. Together with their <u>amici</u>, the plaintiffs raise a host of historical, structural, and practical considerations, including many of the same federalism-related arguments already rejected above, in an attempt to secure a more permissive interpretation of the Fifth Amendment's due process limits.

These arguments, however, provide no persuasive basis for disturbing a binding decision of this Court, especially where that decision accords with existing Circuit case law and the overwhelming weight of authority from the other federal courts of appeals.[17] <u>See</u> <u>Douglass</u>, 46 F.4th at 235, 239 & n.24 (collecting cases from

137). The Government's proposal meets none of those criteria. While the Government assures us that not every conceivable "deemed consent" provision would pass muster under a relaxed Fifth Amendment standard, it fails to identify any workable limitation on the "greater scope" of jurisdiction that would be permitted. Intervenor Br. at 39.

[17] <u>See, e.g.</u>, <u>Douglass</u>, 46 F.4th at 235 ("We . . . hold that the Fifth Amendment due process test for personal jurisdiction requires the same 'minimum contacts' with the United States as the Fourteenth Amendment requires with a state. Both Due Process Clauses use the same language and serve the same purpose, protecting individual liberty by guaranteeing limits on personal jurisdiction."); <u>Herederos de Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.</u>, 43 F.4th 1303, 1308 (11th Cir. 2022) ("[C]ourts should analyze personal jurisdiction under the Fifth Amendment using the same basic standards and

**Add. 63**

the Second, Sixth, Seventh, Eleventh, Federal, and D.C. Circuits); <u>see also</u> <u>Livnat</u>,

851 F.3d at 54–55 & 55 n.5 (similar). Moreover, <u>Waldman I</u> was not the first

---

tests that apply under the Fourteenth Amendment."); <u>Abelesz v. OTP Bank</u>, 692 F.3d 638, 660 (7th Cir. 2012) (finding "no merit" in the contention that the Fifth Amendment "relaxes the minimum-contacts inquiry"); <u>Carrier Corp. v. Outokumpu Oyj</u>, 673 F.3d 430, 449 (6th Cir. 2012) (holding that the Fifth Amendment due process test "parallels" the Fourteenth Amendment analysis); <u>Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found.</u>, 297 F.3d 1343, 1350 (Fed. Cir. 2002) (concluding that the Fourteenth Amendment "minimum contacts" standard "articulated in <u>International Shoe</u> . . . and its progeny" applies in "Fifth Amendment due process cases"). In contending that several federal courts of appeals have held otherwise, <u>see</u> Pls.' Br. at 59–60, the plaintiffs rely on outdated authorities, chief among them a vacated decision of the United States Court of Appeals for the Fifth Circuit, <u>see</u> <u>Douglass v. Nippon Yusen Kabushiki Kaisha</u>, 996 F.3d 289 (5th Cir.) (per curiam), <u>opinion vacated and reh'g en banc granted</u>, 2 F.4th 525 (5th Cir. 2021) (mem.), which subsequently concluded that the Due Process Clauses of the Fifth and Fourteenth Amendments require the same personal jurisdiction analysis, <u>see</u> 46 F.4th 226 (5th Cir. 2022) (en banc). The plaintiffs also misstate the holdings of other cases, which nowhere suggested that the personal jurisdiction requirements of the Fifth Amendment are less stringent than those applicable under the Fourteenth Amendment. <u>See, e.g.</u>, <u>Pinker v. Roche Holdings Ltd.</u>, 292 F.3d 361, 370–71 & 370 n.2 (3d Cir. 2002) (invoking Fourteenth Amendment due process "minimum contacts" standards where the Fifth Amendment applied); <u>see also</u> <u>Peay v. BellSouth Med. Assistance Plan</u>, 205 F.3d 1206, 1211–12 (10th Cir. 2000) (similarly borrowing Fourteenth Amendment standards to conduct a Fifth Amendment inquiry).

      The Supreme Court has never "expressly analyzed whether the Fifth and Fourteenth Amendment standards differ," instead reserving decision on the issue. <u>Livnat</u>, 851 F.3d at 54; <u>see, e.g.</u>, <u>Bristol-Meyers</u>, 582 U.S. at 268–69 ("[S]ince our decision concerns the due process limits on the exercise of specific jurisdiction by a State, we leave open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court."). Other courts of appeals have observed that on at least one occasion, the Supreme Court appears to have "instinctively relied on its Fourteenth Amendment personal jurisdiction jurisprudence" in the Fifth Amendment context. <u>Douglass</u>, 46 F.4th at 239 (citing <u>Republic of Argentina v. Weltover, Inc.</u>, 504 U.S. 607, 620 (1992), in turn quoting <u>Burger King</u>, 471 U.S. at 475); <u>accord</u> <u>Livnat</u>, 851 F.3d at 54.

**Add. 64**

decision of this Court to apply Fourteenth Amendment due process principles in a Fifth Amendment context; the analysis there followed from prior Circuit precedents that "clearly establish[ed] the congruence of [the] due process analysis under both the Fourteenth and Fifth Amendments." 835 F.3d at 330 (citing, among other authorities, Chew, 143 F.3d at 28 n.4, and In re Terrorist Attacks on Sept. 11, 2001, 714 F.3d 659, 673–74 (2d Cir. 2013)); see also Porina v. Marward Shipping Co., 521 F.3d 122, 127–29 (2d Cir. 2008). Therefore, we decline the invitation to abandon our prior ruling and upend settled law on the due process standards under the Fifth Amendment.

To the extent the plaintiffs ask us to revisit any other aspect of our decision in Waldman I, we decline that invitation as well. After explaining that the Fifth and Fourteenth Amendment due process analyses parallel one another in civil actions, Waldman I faithfully applied the Supreme Court's binding due process precedents, including its then-recent decision in Daimler, to conclude that the PLO and the PA could not be subjected to general or specific jurisdiction under the circumstances presented. In three separate cases involving similar ATA claims, the D.C. Circuit Court of Appeals agreed. See Shatsky, 955 F.3d at 1036–37; Klieman,

**Add. 65**

923 F.3d at 1123–26; <u>Livnat</u>, 851 F.3d at 56–57. No aspect of the present dispute

affects our decision in <u>Waldman I</u> as to what constitutional due process requires.

*  *  *

We reiterate the district court's closing observation that just "[a]s in

<u>Waldman I</u>, the killing of Ari Fuld was 'unquestionably horrific' and [the]

[p]laintiffs' efforts to seek justice on his and their own behalf are morally

compelling." <u>Fuld</u>, 578 F. Supp. 3d at 595 (quoting <u>Waldman I</u>, 835 F.3d at 344).

But "the federal courts cannot exercise jurisdiction in a civil case beyond the

limits" of the Due Process Clause, "no matter how horrendous the underlying

attacks or morally compelling the plaintiffs' claims." <u>Id.</u> at 595–96 (quoting

<u>Waldman I</u>, 835 F.3d at 344). The PSJVTA provides for personal jurisdiction over

the PLO and the PA in a manner that exceeds those constitutional limits. Because

the statute violates due process, the defendants cannot be "deemed to have

consented" to personal jurisdiction in this case. 18 U.S.C. § 2334(e)(1).

<strong>CONCLUSION</strong>

We have considered all of the arguments of the parties and their <u>amici</u>. To

the extent not specifically addressed above, those arguments are either moot or

without merit. For the foregoing reasons, we conclude that the PSJVTA's provision

65

**Add. 66**

regarding "deemed" consent to personal jurisdiction is inconsistent with constitutional due process. Accordingly, the plaintiffs' complaint against the PLO and the PA was properly dismissed for lack of personal jurisdiction, pursuant to Rule 12(b)(2). The judgment of the district court is **AFFIRMED.**